STATE OF NEBRASKA, APPELLEE, V. JEFF BOPPRE, APPELLANT.

453 N.W.2d 406

Filed March 30, 1990.    No. 89-481.

Leonard G. Tabor for appellant.

Robert M. Spire, Attorney General, and Sharon M. Lindgren for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

Pursuant to verdicts, defendant-appellant, Jeff Boppre, was

adjudged guilty of two charges of first degree murder in violation of Neb. Rev. Stat. § 28-303 (Reissue 1989), two charges of robbery in violation of Neb. Rev. Stat. § 28-324(1) (Reissue 1989), and two charges of using a firearm to commit a felony in violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 1989). He was thereafter sentenced to consecutive terms of imprisonment for life on the murder convictions, to concurrent terms of imprisonment of 8 to 15 years on the robbery convictions, and to imprisonment for $6^2/3$ to 20 years on each of the use of a firearm convictions, to be served consecutively to all other sentences. Boppre asserts that the district court erred in (1) overruling his plea in abatement, (2) denying bail, (3) refusing a change of venue, (4) denying payment for a public opinion poll, (5) allowing additional endorsement of witnesses, (6) failing to permit certain discovery, (7) sustaining certain of the State's cause challenges to prospective jurors, (8) overruling Boppre's cause challenges to certain prospective jurors, (9) failing to rule on certain motions, (10) failing to sequester the jury, (11) overruling his motion in limine, (12) failing to suppress certain evidence, (13) admitting or excluding certain evidence, (14) refusing a directed verdict, (15) refusing a new trial, and (16) imposing excessive sentences. We affirm.

## II. FACTS

Boppre began using cocaine sometime in 1987. Beginning in July 1988, Ricky Zogg began to supply Boppre with cocaine and marijuana which Zogg purchased from Richard Valdez, who occupied a house north of the town of Scottsbluff with his girlfriend, Sharon Condon. Zogg was allowed to testify, over Boppre's objections, that because Valdez did not know Boppre, Valdez at first would not let Boppre enter Valdez' house, but that after a period of time, Valdez came to trust Boppre enough to let him into the house to buy the drugs himself. Zogg testified that Valdez flaunted his money in front of Zogg and Boppre and told them he had $9,000 to $11,000.

About 2 months before the killings, Boppre suggested to Zogg, "Let's just take [Valdez'] money and his drugs, that way we don't have to buy it [any] more." Zogg agreed, and they planned to "[j]ust go in and shoot [Valdez]." Armed with guns,

Boppre and Zogg twice went to Valdez' house but left before accomplishing their purpose.

For 1 to 2 months before the killings, Boppre had been supplying Kenard Wasmer and Alan Niemann with cocaine which he had been purchasing from Valdez. On the evening before the killings, September 18, 1988, Boppre acquired some cocaine from Valdez at Niemann's request. Boppre met Niemann at a mobile home which Niemann and Wasmer shared, and Boppre and Niemann used the cocaine. During the course of the evening, Boppre and Niemann went to Valdez' house several more times to buy more cocaine. Each time, they acquired about a quarter or half gram of the substance and shared it with Wasmer before returning to Valdez' for more.

Sometime after midnight on September 19, Boppre suggested to Wasmer and Niemann, "Let's just go blow [Valdez] away." According to Wasmer, Boppre

> looked at [Niemann] and asked [Niemann] if he'd go do it with him and [Niemann] said no, that he couldn't do it, he couldn't just shoot somebody. And he kept trying to get [Niemann] to do it and [Niemann] kept saying no and he called him a pussy and asked me, he looked at me and said, "Come on, Wasmer, I know you can do it." I told him, I said, "Dude, the guy has never done nothing to me, I don't even know the man, I'm not going to go do something to him."

Boppre told them, "Well, I'll go do it myself then," and walked out the door. Niemann followed Boppre, telling Wasmer, "I'm going to go talk him out of it." Wasmer remained at the trailer.

Boppre and Niemann went back out to Valdez', where Boppre bought a quarter gram of cocaine and they left. After Boppre and Niemann used the cocaine, Boppre drove to his father's house, where he was living, went inside, changed clothes, and got a gun. They then returned to Valdez' house, and Boppre got out of the vehicle and knocked on the door. According to Niemann, he heard a man's voice yell, "Who is it?" After Boppre identified himself, the door opened and Niemann heard "a loud, 'Oh,' something, 'Oh God, oh, shit.'" Niemann then heard two shots, saw Boppre "jump up into the

house," arms aiming downward, and then heard a series of additional shots.

Niemann went into the house and found Valdez lying on his back on the kitchen floor with his head and shoulders in the middle of the doorway between the kitchen and living room. As Niemann was leaving the house, Valdez rolled onto his right side. Boppre came out of the house and reloaded his gun, saying, "[T]here couldn't be any witnesses." Boppre then went back inside the house, and Niemann heard a woman's high-pitched voice and a series of still more shots. Boppre came out of the house with several items in his hands and then went back into the house and knocked out the kitchen light with a hammer. While traveling back to Niemann's and Wasmer's trailer, Boppre told Niemann, "[Y]ou should have seen it. . . . You should have seen that bitch plead for her life."

When they arrived at the trailer, they carried inside the things that were taken from Valdez—a black purse, a black shaving kit, and a camera with two lenses. Niemann told Wasmer, "He blew them both away." Wasmer noticed Boppre had "something red up the side of his right thumb and he wiped it down the side of the right leg of his blue jeans." Boppre and Niemann went into the back bedroom of the trailer and dumped the contents of the purse onto the floor. Boppre found some cocaine in the purse, and he, Niemann, and Wasmer used it. Then Boppre pulled out a wad of money. According to Niemann, Boppre "mentioned that there was $1,700 there and also . . . said, 'That wasn't good but it wasn't bad either for taking two people's lives.' "

At Boppre's suggestion, Wasmer and Niemann agreed to travel to Phoenix, Arizona, with Boppre, where they could use the money they took from Valdez to acquire a considerable amount of cocaine. They put several of the things they had stolen into the trunk of Boppre's vehicle, Boppre placed the gun he had used for the killings under the front seat of the vehicle, and the three left. Over Boppre's relevance objections, Wasmer was allowed to testify that on their way to Phoenix, Boppre discussed stopping somewhere to buy more shells for the gun and "was talking about going into 7-11, Mini Mart stores, robbing them and killing whoever was behind the cash register

or in the store." This prompted Wasmer to dismantle the gun and throw pieces of it out the window of the vehicle "so they couldn't be replaced" "[t]o keep anybody else from being killed with that gun." The district court instructed the jury that the evidence of Boppre's planned robberies was received for a limited purpose and could only be considered to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, and could not be considered to prove Boppre's character in order to show that he acted in conformity therewith.

Later, while still traveling, Wasmer asked Boppre how he felt about the killings. Boppre "just started laughing and said, 'I like it, I want to do it again.' " At some point, Boppre told Wasmer:

> Well, it started off the conversation, he told me that when he went up to the door he had decided to not shoot anybody, he had changed his mind, he was just going to buy another quarter gram. He said when [Valdez] opened the door, the gun just come up and he pulled the trigger and he said after he pulled the trigger the first time, he couldn't quit.
>
> He said he went inside the house, went into the bedroom and didn't see anybody and he had left the bedroom and then went back in and there was a woman on the other side of the bed that was crouched down behind it and asked him what he wanted, told her he wanted to know where the drugs and the money was and she told him that there was some drugs in her purse and then he shot her.

Near Gallup, New Mexico, Boppre decided to dispose of the gun. According to Wasmer, they drove out of Gallup for

> a ways and [Boppre] spotted . . . quite a big washout beside the road. We stopped, pulled over, [Boppre] got the gun out of the car, we all jumped over the fence, I walked over to the edge of it, stopped . . . [Boppre] and [Niemann] walked on down farther and stayed there for a few minutes, not very long, and then came back, we got in the car and left.

Niemann testified similarly that to dispose of the gun, they

crossed over a fence into a ravine by the side of the road and that Boppre threw the gun into one mud puddle and the gun clip into another puddle.

The morning after the killings, Condon's body was found in the bedroom of the Valdez house, and Valdez' body was found in the kitchen near the doorway into the living room. According to Niemann, who reviewed a picture of Valdez' body as found, Valdez' body was discovered in a different position than when he last saw it. Law enforcement personnel found four shell casings and seven bullets in and around Valdez' body and two shell casings and two bullets around Condon's body. Pieces of glass from a broken light bulb were discovered in the kitchen. Police also found a package of cocaine on Valdez' body and in a closet found a bag containing marijuana and $11,000.

The district court received into evidence, over Boppre's hearsay objections, pictures which portray writing on the floor near where Valdez' body was found and writing on the casement of the door between the kitchen and living room. As depicted in the pictures, the letters "J-F-F B-O-P-E" were written in white grease on the floor by the left side of Valdez' body, and the letters "J-E-F-F" were written toward the bottom of the side of the casement nearer to Valdez' body within reach of the body's right hand.

Police Lt. Robert Kinsey testified that there "appear[ed] to be blood" on the side of the casement closest to Valdez and that the letters written on the door casement appeared to be written in blood. Kinsey further testified that blood was also present on the side of the door casement farther from Valdez. Boppre objected to this testimony after it was given, on the basis that there was no foundation for Kinsey to testify that the substance on the farther casement was blood. The district court asked Kinsey to rephrase his answer, which he did, testifying that the substance "appear[ed] to be blood." Police Det. Mark Overman corroborated Kinsey's testimony, saying that the letters on the side of the door casement nearer to Valdez were written in what "appear[ed] to be blood." Although Boppre objected, Overman was allowed to further testify that it appeared someone wrote the markings on the door casement with a finger.

When Valdez was found, there was white grease present on the index and middle fingers of his right hand and blood present on both of his hands. Valdez' brother testified that Valdez was right-handed. A nearly empty tube of white "lubriplate gear grease" was discovered under Valdez' body. According to a criminalist who testified for the State, the substance in the tube, on the floor, and on Valdez' fingers was "similar and could have originated from a common source." A documents examiner for the Nebraska State Patrol opined that the writing on the floor in grease "was consistent with having been written with a human finger," but testified that the writing was of insufficient quality and quantity for a positive identification of the writer to be made.

The pathologist who performed the autopsies on the two victims discovered four gunshot entrance wounds on Valdez' chest, abdomen, and left arm. According to the pathologist, Valdez died from the gunshot wounds to his chest and abdomen, "which resulted in massive internal damage to the organs" in those areas. The pathologist also opined that an individual with injuries such as Valdez' would live 15 minutes after the wounds were received and could have retained consciousness for 10 to 15 minutes. The pathologist was of the further opinion that it was possible that Valdez could have moved around and written something on the floor and wall for 5 to 15 minutes after receiving the wounds.

The pathologist also testified that Condon had seven "gunshot entrance wounds" located on her head, chest, and arms, which were caused by at least six gunshots. According to the pathologist, Condon died instantly from the gunshot wound to her head, which caused massive brain damage. Because of the gunpowder deposited within the tissues of the skin around the two gunshot entrance wounds to Condon's head and the entrance wounds on her arms, the pathologist was able to determine that the gun was held no more than 3 feet from her body when she was shot.

A pathologist testifying on Boppre's behalf expressed the view that it was "highly unlikely that [Valdez] would have been physically capable of writing the descriptions" which were discovered next to his body. He opined that a person who

sustained the injuries Valdez sustained "would have not remained conscious longer than probably three minutes and probably would have died within the next five or six minutes."

Just after the killings, Boppre's father told law enforcement personnel that Boppre owned a .32-caliber handgun. Although the handgun could not be located in the father's house, the father showed the officers an area southwest of his residence where Boppre practiced shooting at targets with the gun, and allowed them to pick up some .32-caliber shell casings which were lying on the ground.

With Niemann's and Wasmer's help, law enforcement personnel discovered the .32-caliber handgun in the canyon near Gallup, New Mexico, where Boppre had thrown it. The State's ballistics expert described the gun as an LA Industrial Orbea-Eibar .32-caliber semiautomatic pistol. When found, the gun was missing several parts, including a thumb latch safety, the disconnector, the hammer pin, and the sear spring.

Boppre testified that he bought a .32-caliber gun several months before the killings but that he had traded the gun to Valdez about 10 days prior to the killings. According to Boppre, he told his parents and an acquaintance prior to the killings that he had sold the gun. Neither Boppre's father nor Boppre's acquaintance were allowed to testify as to whether Boppre ever made such a statement.

The State's ballistics expert compared the shell casings found in Boppre's father's yard and those found at Valdez' house with shell casings which he acquired from his own test firing of the gun the police recovered near Gallup. He determined that the shell casings which were found at the Boppre and Valdez residences were all fired from the gun the police recovered near Gallup. He also compared the bullets found at the Valdez residence and those he test fired from the gun and determined that the bullets found at the Valdez residence were fired from the gun the police found. The expert testified that if the gun's clip were filled with bullets, the gun could be fired nine times without having to be reloaded.

Michael Neu, who was incarcerated in the Scotts Bluff County jail at the same time as Boppre, testified, over Boppre's objections, that he "built up a situation of trust in regard to

[himself] and . . . Boppre," that Boppre told him "Mr. Valdez couldn't have wr[itten] the name on the floor" because Valdez "was shot and he was dead instantly," and that Boppre said, "You ought to heard the bitch beg for mercy, beg for her life."

## III. ANALYSIS
### 1. Plea in Abatement

Boppre first assigns error to the district court's overruling of the plea in abatement he filed pursuant to Neb. Rev. Stat. § 29-1809 (Reissue 1989). On September 21, 1988, a complaint was filed in county court charging Boppre with two counts of first degree murder. On September 30, the day of the preliminary hearing, an amended complaint was filed in county court charging Boppre with the four additional counts described in part I above. Boppre argues that "[t]he evidence presented at the preliminary hearing was insufficient to enable the County Court to bind" him over for trial and that because four additional charges were added to the complaint on the day of the preliminary hearing, he was unable to adequately prepare for the hearing. Brief for appellant at 12.

Any error in ruling on a plea in abatement is cured by a subsequent finding at trial of guilt beyond a reasonable doubt which is supported by sufficient evidence. *State v. Carter*, 226 Neb. 636, 413 N.W.2d 901 (1987); *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987). The deciding issue is thus whether the evidence was sufficient to support the conviction, *State v. Jacobs, supra*, a matter which is the subject of part III(14) below, which analyzes Boppre's challenge to the sufficiency of the evidence.

### 2. Bail

Boppre twice requested the district court to release him on bail. The district court, however, determined, after reviewing the evidence presented at the preliminary hearing, that "the proof was evident and the presumption great that [Boppre] had committed the crime of murder and that [he] should be held without bail."

The U.S. Supreme Court has never recognized a federal constitutional right to bail under the eighth amendment to the U.S. Constitution. See 2 W. LaFave & J. Israel, Criminal

Procedure § 12.3(b) (West 1984).

While this court has determined that the "federal prohibition against excessive bail is applicable to the states," *State v. Pilgrim*, 182 Neb. 594, 598, 156 N.W.2d 171, 173-74 (1968), it has also determined that neither the 8th nor the 14th amendment to the U.S. Constitution requires that everyone charged with a state offense be given his liberty on bail pending trial. *Parker v. Roth*, 202 Neb. 850, 278 N.W.2d 106 (1979), *cert. denied* 444 U.S. 920, 100 S. Ct. 240, 62 L. Ed. 2d 177, *reh'g denied* 444 U.S. 1104, 100 S. Ct. 1072, 62 L. Ed. 2d 790 (1980).

As Boppre concedes, not all offenses are bailable offenses under the Nebraska Constitution. Neb. Const. art. I, § 9, provides in part: "All persons shall be bailable by sufficient sureties, except for treason, sexual offenses involving penetration by force or against the will of the victim, and murder, where the proof is evident or the presumption great." (Pursuant to Neb. Rev. Stat. § 29-506 (Reissue 1989), only those defendants accused of bailable offenses may be released in accordance with the provisions contained in chapter 29, article 9.)

We conclude that the district court did not err in refusing to release Boppre on bail. At the preliminary hearing, the State established that Valdez and Condon had been shot and killed with a .32-caliber weapon; that in the months prior to the killings Boppre and Zogg had twice planned to kill Valdez for his money; that Niemann, Wasmer, and Boppre were all using cocaine the night of the murders; that Boppre and Niemann went to Valdez' house, where Boppre shot Valdez and Condon and stole some of their possessions; that the three men then traveled to New Mexico, where Boppre disposed of the gun; that Boppre owned a .32-caliber handgun; that the shell casings found at Boppre's father's residence and those found at the crime scene were all fired from the same gun; and that writings implicating Boppre were discovered near Valdez' body. Thus, there was certainly sufficient evidence presented at the preliminary hearing to support the district court's determination that "the proof is evident or the presumption great" that Boppre had committed the murders of Valdez and

Condon. See *State v. Hamilton*, 187 Neb. 359, 190 N.W.2d 862 (1971) (defendant charged with first degree murder properly denied bail under constitutional provision rendering murder a nonbailable offense where the proof is evident or the presumption great).

### 3. Venue

Boppre filed two pretrial motions for change of venue based upon pretrial publicity. The district court denied his motions, stating in answer to Boppre's argument,

> Well, if there are jurors "out to get the defendant," you will have your chance to question them under oath when we begin jury selection. Obviously if there are jurors out to get the defendant the Court's not about to let them serve on a case. We should know that firsthand when jury selection begins.

Boppre urges that his motions for change of venue should have been granted because the publicity was "very inflammatory, prejudicial and sensational"; because the case was more widely publicized in Scotts Bluff County than in other parts of the state; because of the short period of time between the dissemination of the publicity and the time of trial; because the selection of the jury was difficult; because of the number of challenges for cause exercised; because of the severity of the offenses; and because of the size of Scotts Bluff County, which he tells us is approximately 38,344 people.

At the hearings on the motions, Boppre presented a great deal of evidence concerning pretrial publicity. From the time the bodies were found, numerous articles appeared in the local area newspaper reporting details concerning the investigation of the murders, the evidence discovered at the scene of the crime, Boppre's arrest, the evidence presented at the preliminary hearing, all the pretrial proceedings, and the selection of the jury. According to one article, Valdez told his father that "someone was out to kill him" and that if he was killed, he would write the name of "the guy that did the shooting." Several articles reported that Boppre's name had been written in white grease next to Valdez' body.

Boppre also presented videotaped recordings of several local

television news shows that were shown at the time the bodies were found and of several other telecasts that were shown during the time of the trial. Several of the telecasts show footage of Boppre after his arrest, making obscene hand gestures toward the camera. One of the telecasts reports the district court's finding, in declining to set bail for Boppre, that the evidence against Boppre was strong and the presumption great.

Boppre further presented the affidavits of 38 Scotts Bluff County residents that "because of bias, prejudice and hostility" of area residents, Boppre would be unable to receive a fair trial, and of 11 area attorneys that each is convinced it is impossible for Boppre to have a fair trial in Scotts Bluff County. According to the affidavit of the news director for two area radio stations, one of the stations presented 26 reports about the case and·the other 136 reports about the case during the 2 months after the crimes were discovered. According to the affidavits of the news directors for two area television stations, one of the stations presented 14 reports and the other 19 reports during the 2 months after the crimes were discovered.

Jury selection commenced on February 13, 1989, and continued through February 15. The trial did not resume until March 6, 1989. According to both briefs, there were 99 persons on the venire. The record demonstrates that all of the venirepersons had heard something about the case. Twelve venirepersons were excused for cause because they had formed opinions concerning Boppre's guilt or innocence based on pretrial publicity; eight were excused because they indicated they could not be impartial because they knew either Boppre or a member of his family; eight were excused because they indicated they could not be impartial because they knew Valdez or a member of his family; four were excused because they indicated they could not be impartial because they knew certain witnesses; and, finally, one was excused because she worked for the sheriff's department. Of the venirepersons who were not excused for cause, none indicated that they had formed an opinion concerning Boppre's guilt or innocence.

A trial court's ruling on a motion for change of venue will not be disturbed absent an abuse of discretion. *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987); *State v. Bird Head*, 225 Neb.

822, 408 N.W.2d 309 (1987). Neb. Rev. Stat. § 29-1301 (Reissue 1989) provides that upon motion by the defendant the district court shall transfer venue where it appears by affidavits presented to the court that a fair and impartial trial cannot be had in the county where the offense was committed. Accordingly, a trial court abuses its discretion in denying a motion to change venue where a defendant establishes that local conditions and pretrial publicity make it impossible to secure a fair trial. *State v. Jacobs, supra.* Factors to be considered in determining whether a change of venue is required due to pretrial publicity include the nature of the publicity, the degree to which the publicity has circulated throughout the community, the degree to which the publicity circulated in the area to which venue could be changed, the length of time between the dissemination of the publicity complained of and the date of the trial, the care exercised and ease encountered in selection of the jury, the number of challenges exercised during voir dire, the severity of the offenses charged, and the size of the area from which the venire is drawn. *Id.* The law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. *Id.* Indeed, Neb. Rev. Stat. § 25-1636 (Reissue 1989) specifically provides that it shall not be a

> cause of challenge that a juror has read in the newspapers an account of the commission of a crime with which a prisoner is charged, if such juror shall state on oath that it is the belief of said person that he or she can render an impartial verdict according to the law and the evidence; and the court shall be satisfied as to the truth of such statement . . . .

We find no abuse of discretion in the district court's denial of Boppre's motions for change of venue. The various news media accounts are factual and do not reveal a hostility or animosity toward Boppre. Many of the news shows report evidence tending to exculpate Boppre, as well as evidence tending to inculpate him, and display no animosity or bias toward Boppre. In several of the broadcasts, as much suspicion is placed upon

Niemann, the principal witness against Boppre, as upon Boppre himself. The affidavits of individual area residents, stating not that they have formed an opinion of Boppre's guilt or innocence but that area residents in general are biased, prejudiced, and hostile, have no probative value. While 12 venirepersons were excused because they had formed opinions on the basis of pretrial publicity and 21 others were excused because they knew pertinent persons, the jurors who were not excused stated that they had not formed an opinion and could be impartial.

We do not overlook the fact that 19 days elapsed between the completion of the jury selection and the resumption of trial. The practice of permitting such a time interval between jury selection and the resumption of the rest of the trial seems questionable, and we hold that when such a hiatus has been permitted, a trial court must, if requested, grant the parties an opportunity to re-voir dire the jury as selected in order to determine whether anything has transpired in the interim to affect a juror's impartiality. Boppre, however, made no request for additional voir dire. Moreover, the district court repeatedly admonished the venirepersons and the jury when selected not to read or listen to news reports of the case, talk to anyone about the case, nor form any opinion prior to deliberations. In the absence of a showing to the contrary, we indulge the appellate presumption that the selected jurors followed the district court's admonitions. See *Kitts v. State*, 153 Neb. 784, 46 N.W.2d 158 (1951) (mere opportunity to violate admonition provides no basis to find trial court abused its discretion by refusing to investigate jury for possible misconduct).

### 4. Opinion Poll

To provide support for his first motion for change of venue, Boppre requested that the district court authorize the payment of $6,000 to hire a professional pollster to survey prospective jurors in Scotts Bluff County as to whether pretrial publicity would impair Boppre's ability to receive a fair trial. Boppre's attorney filed an affidavit stating that neither Boppre nor his family had the financial means to pay for the survey. At the hearing on the request for survey funding, Boppre and his

father concurred that they did not have the financial means to pay. The district court denied Boppre's request, deciding to wait until voir dire began to determine whether Boppre could receive a fair trial.

Boppre urges that the district court erred in refusing his request, arguing that under *Gideon v. Wainwright,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963), due process and the sixth amendment right to effective assistance of counsel require that the State provide the defendant with the use of any experts that will assist counsel in preparing the defense and that the survey would have been "extremely helpful to the trial court in determining whether or not defendant's motion for change of venue is well taken." Brief for appellant at 14.

Boppre cites us to no Nebraska case on this subject, nor do we find any. In *State v. Watson,* 310 N.C. 384, 312 S.E.2d 448 (1984), where the defendant requested State funds to conduct a survey similar to that Boppre requested, the Supreme Court of North Carolina recognized that an indigent defendant has the right to the effective assistance of counsel and that the State must provide an indigent defendant with the basic tools for preparation of an adequate defense. However, the court determined that expert assistance need only be provided by the State when the defendant can show it is probable he will not receive a fair trial without the expert assistance or upon a showing that there is a reasonable likelihood the assistance will materially assist the defendant in the preparation of his defense. The court concluded that because the defendant had an opportunity to assemble available data on pretrial publicity and to question jurors about their exposure to the publicity and its effect, and because the poll could not demonstrate the amount of bias or whether publicity was noted by individuals who might serve as jurors, the lower court did not abuse its discretion in determining that the defendant had failed to show there was a reasonable likelihood the poll would have materially assisted him in the preparation of his defense.

Similarly, in *State v. Weatherford,* 416 N.W.2d 47 (S.D. 1987), the Supreme Court of South Dakota considered whether the trial court erred in refusing to appoint an expert to conduct a public opinion poll for purposes of a venue motion because of

the pretrial publicity in a first degree murder case. In determining that the trial court did not abuse its discretion in denying the defendant's request, the reviewing court held that voir dire examination is the better forum for ascertaining the existence of community and individual prejudice or hostility toward the accused. See, also, *Wyle v. State*, 777 S.W.2d 709 (Tex. Crim. App. 1989) (pollster to show level of community prejudice for purposes of venue motion was unnecessary, as defendant may offer newspaper accounts, evidence of television or radio coverage, and witnesses from the community); *Wilson v. State*, 250 Ga. 630, 300 S.E.2d 640 (1983), *cert. denied* 464 U.S. 865, 104 S. Ct. 199, 78 L. Ed. 2d 174, *reh'g denied* 464 U.S. 1004, 104 S. Ct. 514, 78 L. Ed. 2d 701; *State v. Haislip*, 237 Kan. 461, 484-85, 701 P.2d 909, 927 (1985), *cert. denied* 474 U.S. 1022, 106 S. Ct. 575, 88 L. Ed. 2d 558 (motion to obtain funds for public opinion poll for purposes of venue motion properly denied where cost of survey was $2,000 and because "random sample of the population would not reliably indicate whether a fair and impartial jury could be selected"); *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828 (1981), *cert. denied* 454 U.S. 882, 102 S. Ct. 364, 70 L. Ed. 2d 191 (refusal pursuant to state statute to appoint for indigent defendant an expert to conduct public opinion poll in order to determine for purposes of venue motion the extent pretrial publicity has permeated the community was proper because jury selection and venue are not matters having a bearing on the ultimate question of the defendant's guilt or innocence and thus were not contemplated by state statute's requirement that expert be necessary to the presentation of the defense at trial); Annot., 74 A.L.R.4th 330 (1989).

The refusal of a trial court to grant a motion for a public opinion poll rests within the court's discretion. See *State v. Weatherford, supra*. See, also, *State v. Gagliano*, 231 Neb. 911, 438 N.W.2d 783 (1989) (the right of an indigent defendant to the appointment of an expert witness at State expense generally rests in the discretion of the trial court). Assuming, but not deciding, that there are circumstances under which it would be an abuse of discretion to deny an indigent defendant funds to conduct a public opinion poll, we conclude that in this case the

district court did not abuse its discretion in denying Boppre's motion for such. As suggested in *State v. Weatherford, supra*, voir dire examination is the better, more probative forum for ascertaining the existence of community and individual prejudice or hostility toward the accused. Boppre had the opportunity to thoroughly question the venirepersons concerning their ability to be impartial. Further, Boppre had an opportunity to assemble a variety of data on the pretrial publicity, including newspaper articles, radio and television reports, and the affidavits of various people in the community. The poll was not necessary to Boppre's presentation of evidence in support of his motion for change of venue.

### 5. Endorsement of Additional Witnesses

On February 6, 1989, a month prior to the trial, the State filed a motion to endorse upon the information four additional witnesses, Neu, Fred Ruff, Robert Gall, and Jeffrey Patterson. A hearing on the motion was held on February 24, 1989, 10 days prior to trial, after which the district court permitted the endorsement.

Boppre asserts that the allowance of the endorsement about 9 days before trial allowed

> insufficient time for the defense to adequately prepare for those witnesses' testimony at trial. This constitutes "surprise" to the defense, was unfairly prejudicial . . . and was an abuse of discretion . . . . Especially the testimony of witnesses Neu (incriminating statements allegedly made by Defendant) to him and Robert Gall (testimony that he had sold the .32 caliber handgun to Defendant) were extremely important matters, and lack of sufficient time to discover and prepare for their testimony prohibited Defendant from receiving a fair trial.

Brief for appellant at 34.

Pursuant to Neb. Rev. Stat. § 29-1602 (Reissue 1989), a trial court may, in the exercise of its discretion, permit the names of additional witnesses to be endorsed upon the information after the information has been filed when doing so does not prejudice the defendant in the preparation of his defense. *State v. Mecum*, 225 Neb. 293, 404 N.W.2d 431 (1987); *State v. Ellis*,

223 Neb. 779, 393 N.W.2d 719 (1986). The purpose of § 29-1602 is to notify the defendant as to witnesses who may testify against him and give him an opportunity to investigate them. *State v. Ellis, supra.* We have held that to obtain a reversal on the grounds of an additional endorsement of witnesses, the defendant must have requested a continuance at trial and must demonstrate prejudice. *Id.*

We begin by noting that Robert Gall was not called as a witness by the State but, instead, was called by Boppre during his case; thus, Boppre can certainly show no prejudice as to the claimed late endorsement of Robert Gall. Further, it was not Robert Gall, as Boppre asserts, but Carl Gall who testified that he sold a .32-caliber handgun to Boppre. Carl Gall was endorsed as a witness upon the original information.

For at least 1 month before trial, Boppre was aware, from the State's motion, that the witnesses the State wished to endorse might testify at trial. At the hearing on the endorsement motion, the State provided Boppre with information as to the expected content of the witnesses' testimony. Boppre had 10 days thereafter to review the evidence and interview the witnesses. Furthermore, Boppre could have requested a continuance if he needed more time to prepare for these witnesses. At the hearing on the motion, the State stated that witness Neu did not come forward with his testimony until February 3. In light of these factors, we hold that it was not error for the district court to allow the State to endorse the additional witnesses.

### 6. Discovery

In a pretrial discovery motion, Boppre requested that the State provide him with, among other items, (1) any police reports known to the State involving Ricky Zogg, Richard Valdez, and Sharon Condon during the past 5 years "in order to determine what other person or persons might have had a motive to commit the crimes"; (2) any documents that the State intended to use for purposes of refreshing witnesses' recollections; and (3) any and all prior oral and written statements of any witnesses the State planned to have testify. The district court granted Boppre's discovery motion as to all

items, except the three listed above on the basis that the above requests were outside the scope of Neb. Rev. Stat. § 29-1912 (Reissue 1989). The district court noted that Boppre would have the opportunity to review any documents used to refresh any witness' recollection at trial, as required by Neb. Rev. Stat. § 27-612 (Reissue 1989). In addition, Boppre requested and was allowed to depose Zogg, Niemann, Wasmer, and Condon's mother.

A trial court is vested with broad discretion in considering discovery requests of defense counsel, and error can be predicated only upon an abuse of discretion. *State v. Blair*, 230 Neb. 775, 433 N.W.2d 518 (1988); *State v. Meis*, 217 Neb. 770, 351 N.W.2d 79 (1984).

Boppre fails to show how he was prejudiced by the district court's refusal to grant discovery of the three items. He does not claim that he was denied the opportunity at trial to review any documents used to refresh any witness' recollection, and nothing in the record indicates that the State possessed, see Neb. Rev. Stat. § 29-1914 (Reissue 1989), or that there even existed, prior statements of which Boppre was not aware or that the past criminal records of either of the victims or of Zogg would have revealed that persons other than Boppre had a motive to commit the crimes. Furthermore, Boppre was allowed to depose the three witnesses whose testimony was most prejudicial to him, providing him an opportunity to inquire as to the existence of any prior statements made by those witnesses. See *State v. Meis, supra* (holding trial court did not abuse its discretion, in prosecution for first degree murder and use of a firearm in the commission of a felony, in overruling defendant's motion to require the State to furnish copies of all statements taken from every witness whom the State intended to call at trial and to produce copies of reports of some nine law enforcement officials, where leave was granted defendant to depose all of the State's witnesses, and where there was no showing that the requested evidence was either favorable or material to the case).

Boppre makes no claim that the district court's failure to grant discovery of the requested items infringed his sixth amendment right to confrontation. Nor does Boppre claim that

the prosecutor withheld evidence favorable to him and material to his guilt or innocence, and thus he raises no issue under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Even if he were making such claim, it would fail. Under *Brady* and *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), although the due process clause requires the prosecutor to disclose exculpatory evidence which is material to the accused's guilt or innocence, such evidence is material only if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. See *State v. Jackson*, 231 Neb. 207, 435 N.W.2d 893 (1989). The record simply fails to demonstrate that the outcome of the trial would have been different had Boppre's discovery requests been granted.

### 7. State's Cause Challenges

Boppre asserts that the district court erred in excusing two venirepersons, Helen Hort and Bertha Neideffer, from jury service because of their opposition to the death penalty. Boppre concedes that the law is, as we stated in *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989), that it is entirely permissible to exclude from jury service venirepersons whose views on capital punishment are such as to prevent or substantially impair their ability to impartially apply the law to the evidence. See, also, *Lockhart v. McCree*, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986); *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987); *State v. Burchett*, 224 Neb. 444, 399 N.W.2d 258 (1986); Neb. Rev. Stat. § 29-2006(3) (Reissue 1989) (which provides that it is good cause to challenge one called for jury service in a capital case if his or her opinions are such as to prevent "finding the accused guilty"). However, Boppre asserts that neither Hort nor Neideffer indicated an inability to be impartial.

The district court excused Hort on the basis of the following colloquy:

> THE COURT: Okay. Two counts in this case have first degree murder, and for the potential punishment that can be imposed includes the death penalty on those two counts.

People's attitudes toward the death penalty are relevant in determining whether they should sit on a jury in a case or not. How many of you, we have 13 people left, how many of you oppose the death penalty? One. Does anyone oppose, again? Okay. That one was Mrs. Hort, right?

JUROR HORT: (Nods head affirmatively.)

THE COURT: Do you believe it's not right to do that?

JUROR HORT: I believe it's not right.

. . . .

MR. TABOR: . . . Now do you any of you believe that your convictions are so strong that you cannot follow the instructions as he reads them to you and gives you a written copy of the instructions?

JUROR HORT: I'm sure I can.

. . . .

MR. TABOR: Do you think it's true that every citizen that is called to jury duty should set aside their opinions as to whether any law is wrong or right and follow the law as the judge instructs you to do?

JUROR HORT: It's hard to state my opinion but, like the judge says, you have to be neutral, and I don't know. I do — I feel my convictions, what I just said, I do not believe in capital punishment.

MR. TABOR: Do you understand that as a juror in a case like this if there's a conviction that the [jury] has no say-so in the sentencing whatsoever?

. . . .

JUROR HORT: . . . I understand that.

MR. TABOR: Given that fact, do you think you could follow the judge's instructions . . . ?

JUROR HORT: I'm sure I could follow the judge's instructions.

MR. TABOR: You feel that you can impartially weigh the evidence presented by both sides in this case?

JUROR HORT: I think I could listen to it. That's a hard question to ask, I'm sure I could, I just know what the end result could be and if that's not my worry as far as — I don't know how to answer that question. I really don't.

. . . .

MR. TABOR: Do you think you could set aside your opinion . . . and decide [this case] in a fair and impartial manner both as to the defendant and as to the State?

JUROR HORT: I don't know. I can't answer that question. I can't answer that.

MR. TABOR: If the judge should instruct you to put aside personal opinions when deciding this case you would follow his instructions, wouldn't you?

JUROR HORT: Yes, I believe so.

. . . .

THE COURT: The bottom line is you believe in your heart you would be influenced; is that right?

. . . .

JUROR HORT: I believe so.

THE COURT: That it would affect you in reaching that ultimate decision of guilt or innocence?

JUROR HORT: Yes.

The district court excused Neideffer after she indicated that she was opposed to the death penalty and expressed the following reservations about serving as a juror where the death penalty was a potential sentence:

JUROR NEIDEFFER: . . . I would like to say that I don't feel that I would like to serve as a juror for someone who is up on these charges.

THE COURT: Because of the view you are afraid?

JUROR NEIDEFFER: Because of my view and because of my religious beliefs.

THE COURT: You are not the only one, by the way.

JUROR NEIDEFFER: I just want to make that statement because I don't believe in capital punishment.

. . . .

JUROR NEIDEFFER: I don't want to be on a jury where somebody might be condemned to death because I would feel guilty.

The retention or rejection of a venireperson as a juror is a matter of discretion with the trial court. *State v. Rice*, 231 Neb. 202, 435 N.W.2d 889 (1989); *State v. Coffman*, 227 Neb. 149, 416 N.W.2d 243 (1987). The district court did not abuse its discretion in determining that Hort's and Neideffer's views were

such that they would prevent or substantially impair the venirepersons' ability to be impartial. Although Hort stated she could follow the judge's instructions, she ultimately expressed the view that her views on capital punishment would influence her decision. Similarly, Neideffer stated she could not render a guilty verdict without feeling guilty. Both indicated that because of their opposition to the death penalty, they could not perform their duties as jurors.

### 8. Boppre's Cause Challenges

Boppre further asserts that the district court erred in overruling his challenges for cause relating to numerous prospective jurors. He does not discuss this error in his brief, however, and, thus, we cannot determine which jurors he claims should have been excused nor why he claims they should have been excused. We do not consider assigned errors which are not discussed. See *State v. Narcisse*, 231 Neb. 805, 438 N.W.2d 743 (1989).

### 9. Ruling on Motions

Boppre contends that the district court's failure to rule on four motions he made during trial, namely, a motion for individual questioning of jurors, a motion to prevent unlawful use of peremptory challenges, a motion to submit NJI 14.80 prior to death-qualifying the venire, and a motion to preclude death-qualifying the venire, was a "blatant irregularity in the proceedings of the Court" and "prohibited [Boppre's] ability to receive a fair trial herein." Brief for appellant at 36.

It is impossible to understand Boppre's complaint in regard to the district court's alleged failure to rule on his motion for individual questioning of jurors in light of the fact that Boppre was permitted to and did ask questions of whichever individual venirepersons he chose.

Also impossible to understand is Boppre's complaint that the district court failed to rule on his motion to prevent the State from using its peremptory challenges "for the unlawful purpose of excluding from the jury persons who may entertain scruples against the death penalty . . . ." To the extent the complaint relates to "death-qualifying" the jury, the matter is resolved by the analysis which relates to his next complaint. If the claim is

that the State made other "unlawful" uses of its peremptory challenges, there simply is no showing that such in fact occurred.

This brings us to Boppre's next complaint, which claims that the district court failed to rule on his "motion to preclude death qualification" of the venire. Yet, according to one of the district court's journal entries, the district court overruled this motion and, as is evident from the record, proceeded to question the venire as to whether any person's views on capital punishment were such as to prevent or substantially impair his or her ability to impartially apply the law to the evidence. Moreover, we have repeatedly rejected the argument that such questioning produces a more conviction-prone jury than would otherwise be the case. *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989); *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987); *State v. Burchett*, 224 Neb. 444, 399 N.W.2d 258 (1986).

Boppre's last complaint in this regard is as devoid of merit as the foregoing three. It claims that the district court failed to rule on his "motion to submit NJI 14.80 prior to allowing death qualification." However, the record shows that twice prior to questioning each group of venirepersons as to whether any persons had scruples against the death penalty, the district court instructed them in accordance with NJI 14.80, which provides: "You have nothing whatever to do with the punishment of the defendant in the event of his conviction. Therefore, in determining his guilt or innocence, you have no right to take into consideration what punishment he may or may not receive in the event of his conviction."

## 10. Nonsequestration

Boppre requested that the jury be sequestered from the time it was selected and sworn. The district court denied his request but, as required by Neb. Rev. Stat. § 29-2022 (Reissue 1989), ordered the jury sequestered during its deliberations and, throughout the trial, repeatedly admonished the jury not to discuss the case among themselves or with anyone else, not to listen to any conversation concerning the case, not to read or listen to news reports about the case, and not to form or express

an opinion until submission of the case to it. Boppre urges that the

> overwhelming evidence of the pretrial publicity in this matter, and the probability that the media would focus its attention on the trial of the matter, should have convinced the Trial Judge to sequester the jury from and after the time that they were in fact selected to serve on the jury. In any event, the Court should have sequestered the jury once the trial commenced. . . . The possibility of a juror or jurors being exposed to publicity during the trial was so great that the Court did abuse its discretion in failing to sequester the jury.

Brief for appellant at 14-15.

The determination of whether a jury should be sequestered during the trial of a criminal case is left to the discretion of the trial court, and absent an abuse of that discretion or evidence of jury tampering or misconduct, its decision will not be reversed on appeal. *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989). Boppre makes no showing that any juror was actually exposed to publicity, that any other juror misconduct occurred, nor that he was in any other way prejudiced by the district court's refusal to sequester the jury during trial. Therefore, we hold that it was not error for the district court to deny Boppre's motion to sequester the jury from the time of its selection.

### 11. Motion in Limine

Boppre contends that the district court erred in overruling that part of his motion in limine which sought to prevent the State from introducing any testimony from Zogg, Niemann, or Wasmer. Because Boppre limits his discussion to Zogg's testimony, so do we. Boppre argues that Zogg should not have been allowed to testify about the two occasions when he and Boppre planned to shoot and rob Valdez. Boppre did not object at trial to any of Zogg's testimony concerning these incidents and thus waived any claim of error. When a trial court overrules a motion in limine to exclude certain evidence, the movant must object when that evidence is offered during trial in order to predicate error upon the admission of that evidence. *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989).

## 12. Motion to Suppress

Boppre ·further complains about the district court's overruling of his motion to suppress, which sought to prevent admission into evidence of the handgun found near Gallup, New Mexico, and the shell casings seized from Boppre's father's residence, because the searches which generated this evidence were "made without warrant and authority; made without the consent of the Defendant; made without exigent circumstances to justify a search without a warrant; the searches were not incident to an arrest, without probable cause and were unreasonable." Brief for appellant at 33-34. Once again, Boppre did not object at trial to the admission into evidence of the handgun or the shell casings and thus waived any claim of error as to their admission. *State v. DiBaise*, 232 Neb. 217, 440 N.W.2d 223 (1989) (even though the district court has considered the admissibility of certain evidence in ruling on a pretrial motion to suppress, the movant must object to the introduction of the evidence at trial in order to predicate error upon it). See, also, *State v. Cox, supra*.

## 13. Admission and Exclusion of Evidence
### (a) Photographs of Writing

Boppre asserts that the district court erred by allowing into evidence photographs which depicted the writing on the floor and on the door casement in Valdez' residence, arguing that the writings are hearsay and do not fit within any exceptions to the hearsay rule. While Boppre is correct that the writings are hearsay, it cannot be said the district court erred in determining that the writings constitute both excited utterances and dying declarations, and thus are admissible into evidence under exceptions to the hearsay rule.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Neb. Rev. Stat. § 27-801(3) (Reissue 1989), and a statement is defined in part as "an oral or written assertion," § 27-801(1). Because the writings are written out-of-court statements offered to prove that Boppre committed the crimes, they are hearsay.

Neb. Rev. Stat. § 27-803(1) (Reissue 1989) provides a

hearsay exception, even where the declarant is available, for a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." We have determined that in order for a statement to qualify as an excited utterance, three conditions must exist: (1) There was a startling event; (2) the statement relates to the event; and (3) the statement was made by the declarant while under the stress of the exciting event. *State v. Lee*, 216 Neb. 63, 341 N.W.2d 600 (1983). Neb. Rev. Stat. § 27-804(2)(b) (Reissue 1989) provides a hearsay exception, where the declarant is unavailable as a witness, for a "statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death." We agree with the district court's determinations that there was sufficient evidence to establish that Valdez was the person who wrote Boppre's name on the floor and door casement, that the three conditions for an excited utterance existed, and that Valdez wrote Boppre's name while believing that his death was imminent.

### (b) Condon's Statements to Mother

Boppre attacks the district court's sustainment of objections by the State to two questions Boppre put to Condon's mother during her testimony. Boppre asked Condon's mother whether Condon had ever talked about any problems she and Valdez had at their house. The district court sustained the State's objection to the question on the ground that the question called for hearsay. After Condon's mother testified that Condon and Valdez went to Texas several weeks before their deaths and stayed for 10 days to 2 weeks, Boppre asked her if she knew why they went to Texas. The district court again sustained the State's objection to the question on the ground of hearsay and told the witness she could not repeat "what someone else told [her]."

Boppre concedes that the two questions sought hearsay answers, but argues that the catchall exception contained in § 27-804(2)(e) applies to the out-of-court statements sought to be introduced. That statutory rule sets forth a hearsay exception, where the declarant is unavailable, for a

statement not specifically covered by any of the foregoing

exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (i) the statement is offered as evidence of a material fact, (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Boppre admits that he did not provide notice to the State that he was planning to offer the statements, but argues that such notice was unnecessary in this case because "the defense had taken a deposition of the witness, on a prior occasion, in the presence of the State, at which time those matters were inquired into." Brief for appellant at 37-38.

In *State v. Leisy*, 207 Neb. 118, 295 N.W.2d 715 (1980), we considered and rejected a similar argument. There, the defendant argued that certain hearsay evidence should have been admitted under § 27-804(2)(e). We concluded at 129-30, 295 N.W.2d at 723:

The ruling of the court in rejecting the offer was correct . . . . The proponent did not make known to the adverse party the proposal to use the hearsay testimony. The giving of such notice is one of the requirements necessary to make such evidence admissible. The prosecutor did know of Mrs. Schafer's statement and, because of her emotional condition, had agreed not to call her. He did not know, however, that the defense proposed to use her out-of-court statement. The defendant argues that, under these circumstances, the giving of the notice was unnecessary. Two opinions of the Second Circuit U.S. Court of Appeals have held that the pretrial notice requirement is to be rigidly enforced. [Citations omitted.]

Some courts have held otherwise. [Citation omitted.] We hold that the notice requirement is mandatory.

Thus, it is not enough that the adverse party is aware of the unavailable declarant's statement; the proponent of the evidence must provide notice to the adverse party of his intentions to use the statement in order to take advantage of the hearsay exception in § 27-804(2)(e). Because Boppre did not provide the necessary notice, he cannot take advantage of the exception.

Moreover, because we have no indication of what Condon's statements to her mother were, we cannot determine whether the statements have the necessary "circumstantial guarantees of trustworthiness," nor can we determine whether the statements were offered as evidence of material fact. The district court did not err in refusing to allow Condon's mother to testify concerning statements Condon had made.

### (c) Door Markings

Boppre asserts that the district court erred in allowing Police Detective Overman to testify that it appeared someone wrote the markings found on the door casement with a finger. He argues that Overman was "not ever qualified by the State as being an expert witness or otherwise qualified . . . to be able to answer that particular question." Brief for appellant at 38.

Because Overman was not qualified as an expert, the question is whether the subject was proper for a lay witness. Neb. Rev. Stat. § 27-701 (Reissue 1989) provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Accordingly, we have held that lay testimony should be excluded whenever the point is reached at which the trier of fact is being told that which it is itself entirely equipped to determine. *State v. William*, 231 Neb. 84, 435 N.W.2d 174 (1989).

Overman testified as to personal observations he made of the

writings at the scene of the crime, and his testimony was helpful to the jury, which only saw the writings as depicted in photographs. As such, the district court did not err in allowing Overman's testimony.

### (d) Plans to Rob

In regard to this assignment of error, Boppre first asserts that Wasmer's testimony that Boppre "was talking about going into 7-11, Mini Mart stores, robbing them and killing whoever was behind the cash register or in the store" was received in violation of the hearsay rule. Boppre's statements to Wasmer are clearly not hearsay under § 27-801(4)(b), which provides that a statement is not such if it is offered against a party and is the party's own statement.

Boppre apparently also makes the argument that the testimony is improper evidence under Neb. Rev. Stat. § 27-404(2) (Reissue 1989), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The subject rule is an inclusionary one which permits the use of evidence of other crimes, wrongs, or acts if such is relevant for any purpose other than to show the defendant's propensity or disposition to commit the crime charged. *State v. Ruyle, ante* p. 760, 452 N.W.2d 734 (1990); *State v. Methe,* 228 Neb. 468, 422 N.W.2d 803 (1988). There are four requirements for the admissibility of evidence under § 27-404(2): (1) The evidence must have a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must outweigh its potential for unfair prejudice; and (4) the district court must instruct the jury to consider the evidence only for the purpose for which it was admitted. *State v. Ryan,* 233 Neb. 74, 444 N.W.2d 610 (1989).

Assuming that Boppre's statements of an intention to commit a crime constituted evidence of other "crimes, wrongs, or acts" for purposes of § 27-404(2), Boppre's statements to

Wasmer were nevertheless admissible for the purpose of showing why Wasmer disassembled the gun and for corroborating Wasmer's testimony by connecting the facts that Wasmer disassembled the gun and that the gun was found with several parts missing. Moreover, the district court instructed the jury that the evidence was being received and could only be considered for properly limited purposes. The district court did not err in admitting Boppre's statements into evidence.

### (e) Past Threats by Wasmer and Niemann

Boppre further complains about the district court's sustainment of the State's objections to Boppre's questions to Wasmer as to whether Wasmer had ever threatened to kill anybody or ever told another person he was going to kill anybody. The district court sustained the objections on the basis that the questions sought irrelevant information. Boppre argues that the

> answers to those questions should have been allowed by the Court, because they might have been reflective on the character of the witness, and his past patterns or incidents of violent behavior or threats. He had originally been a suspect in the case, and a jury should have been able to consider evidence of this nature (bias and prejudice).

Brief for appellant at 38-39.

The district court properly determined that the evidence was not relevant. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989); Neb. Rev. Stat. § 27-401 (Reissue 1989). Whether Wasmer threatened persons other than Valdez or Condon is not probative of any fact that is of consequence to the determination of this action.

Similarly, Boppre complains about the district court's sustainment of the State's relevance objection to Boppre's question to Niemann as to whether he remembered "making any statement . . . concerning some physical acts [he was] threatening to do against some third parties" other than Valdez. Boppre argues that Niemann should have been allowed to

answer the question because the "partiality of a witness is subject to exploration at trial and is always relevant as discrediting the witness and affecting the weight of his testimony." Brief for appellant at 39. Boppre does not explain how evidence of past threats made by Niemann is probative of Niemann's partiality. Just as discussed above, this evidence is not relevant.

### (f) Zogg Testimony

Boppre's next claim is that the district court erred in permitting Zogg to testify, over Boppre's hearsay and improper opinion objections, that because Valdez did not know Boppre, Valdez at first would not let Boppre enter Valdez' house, but that after a certain period of time, Valdez would allow Boppre to enter the house and buy the drugs himself. Boppre urges that Zogg was not qualified to give an opinion "of Richard Valdez's actions" and that the answer contains hearsay. Brief for appellant at 39.

Zogg's testimony is based upon his personal observations rather than upon anything Valdez said and thus is not hearsay. Furthermore, Zogg's lay conclusion as to the relationship between Valdez and Boppre is rationally based upon his perception and was helpful to the jury in understanding how Boppre came to know and buy drugs from Valdez and, thus, is admissible under § 27-701 as set forth in a preceding discussion.

Moreover, Boppre has not shown how the introduction of this evidence was prejudicial to him in any way. Boppre himself testified that he bought drugs from Valdez at Valdez' house on many occasions. A conviction will not be set aside in the absence of a showing that an error prejudiced the defendant. *State v. Rowland, ante* p. 846, 452 N.W.2d 758 (1990); *State v. Chapman, ante* p. 369, 451 N.W.2d 263 (1990). Improper admission of evidence constitutes harmless error where the evidence is cumulative and there is other competent evidence to support the conviction. *Rowland, supra; Chapman, supra.*

### (g) Neu Testimony

Boppre further claims that Neu should not have been allowed to testify that he "built up a situation of trust in regard to himself and Defendant" when they were in jail together

because it amounted to a "conclusion as to what was in the mind of the Defendant, something which . . . Neu could not have possibly known." Brief for appellant at 39. The problem with Boppre's argument is that Neu was not testifying that Boppre believed there existed a situation of trust between them but that Neu himself believed there existed a situation of trust between them. Neu did not lack personal knowledge to express his own view of the relationship he had with Boppre.

### (h) Boppre's Statements to Neu

Error is also assigned to the introduction of the statements Boppre made to Neu while the two were incarcerated, on the basis that the State "has not laid sufficient foundation to enable the witness to answer those types of questions." Brief for appellant at 39. The State established where and when the conversation between Neu and Boppre took place, that no other person was present during the conversation, and that no other person could have overheard the conversation. Boppre did not enlighten the district court, nor does he enlighten us, as to what further foundation was necessary.

### (i) Robert Kinsey's Testimony

Boppre complains that the district court erred in allowing Kinsey to testify that there was blood on the door casement, for the reason that "Kinsey was never qualified as an expert witness to the extent he would be able to give his opinion as to something of that nature." Brief for appellant at 40. As noted in part II above, although Kinsey at first testified the substance on the casement was blood, Boppre objected, and the district court asked Kinsey to rephrase his answer, which Kinsey did, testifying that the substance "appear[ed] to be blood." Boppre did not object to Kinsey's second answer. However, even if Boppre had preserved his objection to the second answer, Kinsey's testimony was nevertheless properly admitted. As set forth previously, under § 27-701 if the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue. Kinsey testified as to personal observations he made of

the substance at the scene of the crime, and his testimony was helpful to the jury, which only saw the substance as depicted in photographs. As such, the district court did not err in allowing Kinsey's testimony.

### (j) Gun Sale

In two related assignments, Boppre complains about the district court's refusal to allow his father and an acquaintance to testify as to whether Boppre told them he sold his .32-caliber handgun to Valdez. Boppre made an offer of proof at trial that the acquaintance would testify that "within a month . . . of the murders . . . Boppre informed him that he had sold that .32 caliber handgun to Richard Valdez. And that he would also testify that he was aware that [Boppre] had been attempting to sell that gun prior to . . . that time."

Boppre concedes that any statements he may have made to his father or his acquaintance are hearsay, but argues that the statements are admissible under § 27-803(2). That rule sets forth a hearsay exception, even where a witness is available, for

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

As specifically provided under § 27-803(2), hearsay statements of memory offered to prove the fact remembered are not admissible under the state-of-mind exception. Thus, Boppre's statements that he sold his gun to Valdez are not admissible under § 27-803(2) to prove that he did indeed sell his gun to Valdez.

According to the offer of proof, the acquaintance would have testified that "he was aware that [Boppre] had been attempting to sell that gun" prior to the time he allegedly sold it to Valdez. The offer of proof is not sufficient to show that the evidence should have been admitted. The record provides no indication of whether the acquaintance's awareness that Boppre was trying to sell his gun was based upon his own personal

knowledge, in which case the evidence would be admissible, or whether the acquaintance's awareness was based upon statements that another person made to him, in which case the evidence would be hearsay. If the acquaintance's awareness that Boppre had been trying to sell his gun was based on statements Boppre had made to him prior to allegedly selling the gun, statements that he was planning to sell the gun, then those statements would be admissible under § 27-803(2). However, if the acquaintance's awareness that Boppre had been trying to sell his gun was based on statements Boppre had made to him after he sold the gun, statements that he had been trying to sell the gun, then the statements would not be admissible under § 27-803(2). Thus, the district court did not err in refusing to admit the testimony on the basis of the offer of proof.

Boppre made no offer of proof with respect to his father, and, thus, there is nothing to discuss with respect to that matter. See, *State v. Schroder*, 218 Neb. 860, 359 N.W.2d 799 (1984); Neb. Rev. Stat. § 27-103 (Reissue 1989).

### (k) Opinion Testimony re Writing

Boppre tried to introduce into evidence the opinion of Douglas Caywood, a "forensic science consultant," concerning whether one could write the letters found on the floor and door casement in the dark. As part of this witness' job, he studied and made identifications of the handwriting of vision-impaired people. The district court sustained the State's objections on the basis that the witness was not qualified, stating that the studies made by him were "dissimilar" to the question at hand.

Boppre claims the consultant's opinion should have been received, apparently on the basis that he qualified the consultant as an expert to give such opinion. Neb. Rev. Stat. § 27-702 (Reissue 1989) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Thus, in order for expert testimony to be admissible, the witness must be qualified as an expert relative to the matter about which he testifies, and his testimony must be

helpful to the jury.

Boppre failed to show that the consultant was qualified to form an opinion whether the letters could have been written in the dark. The consultant's experience and training in studying and making identifications of the handwriting of vision-impaired people is not sufficient to qualify the consultant to testify as to whether a sighted person could write in the dark.

As with the admission of all evidence, the admission of evidence from expert witnesses is a matter left to the discretion of the trial court, and its ruling will be upheld absent an abuse of discretion. *Dotzler v. Tuttle, ante* p. 176, 449 N.W.2d 774 (1990). It was not an abuse of discretion for the district court to determine that the consultant was not qualified to give the opinion Boppre sought.

### 14. Submission to Jury

Boppre complains that the district court erred in overruling his motion to dismiss the charges at the close of the State's case and his motion for directed verdict at the close of all the evidence, for the reason that the record "shows a complete failure of evidence to establish the essential elements of the crime [sic] charged, and the evidence was so doubtful in character and lacking in probative value that a conviction based thereon could not be sustained." Brief for appellant at 42.

On a defendant's motion to dismiss for insufficient evidence of the crime charged against the defendant, the State is entitled to have all its relevant evidence accepted as true, the benefit of every inference reasonably drawn from the evidence, and every controverted fact resolved in its favor. *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989). In a criminal case a district court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged, or (2) the evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained. *Id.*

Viewing the evidence in the light most favorable to the State, there was certainly sufficient evidence for the jury to conclude that Boppre killed Valdez and Condon purposely and with

deliberate and premeditated malice in violation of § 28-303, that with the intent to steal he forcibly and by violence or by putting in fear took from Valdez and Condon money or personal property in violation of § 28-324(1), and that he used a deadly weapon to commit felonies in violation of § 28-1205(1).

In a related argument, although not assigned as error, Boppre argues that the evidence was insufficient to support his convictions. He urges that because Niemann's testimony was the "only real direct evidence" against him, "it is imperative that this Court review [Niemann's] testimony . . . to weigh his credibility, even though this Court does not normally do that." Brief for appellant at 35. Boppre urges that Niemann lacks credibility because of his past prior felony convictions, the fact that the State offered him a plea agreement for his participation in the events, and that Niemann's testimony was "wholly impeached" and "totally contradicted" at trial. Brief for appellant at 35-36.

Despite Boppre's supplication that we reweigh Niemann's testimony, it is simply not within our province to do so. We have repeatedly stated that in determining the sufficiency of the evidence to sustain a criminal conviction, it is not the province of the Supreme Court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *State v. Wyatt, ante* p. 349, 451 N.W.2d 84 (1990); *State v. Frazier, ante* p. 107, 449 N.W.2d 230 (1989).

## 15. New Trial Motion

Boppre asserts the district court erred in failing to grant him a new trial because of, in addition to matters resolved by the preceding analyses, misconduct by the prosecutor and by certain spectators. The granting or refusal of a motion for new trial is left to the discretion of the trial court, and in the absence of an abuse of that discretion, the determination will not be disturbed on appeal. *State v. Whiteley, ante* p. 693, 452 N.W.2d 290 (1990); *State v. Andersen,* 232 Neb. 187, 440

N.W.2d 203 (1989). Moreover, in order for a new trial to be granted, it must be shown that a substantial right of the defendant's was adversely affected and that the defendant was prejudiced thereby. *State v. Whiteley, supra.*

### (a) Prosecutorial Conduct

Boppre suggests that the prosecutor made an improper remark in the following excerpt from the State's closing argument:

> And guess what they said? Mr. Tabor gets up and he says, ladies and gentlemen, in the middle of the night on the way back from Phoenix, [Boppre] wakes up and the guys have pulled off the road, [Wasmer] and [Niemann] have pulled off the road on the interstate in the middle of the night. Okay. So he wants you to believe that they're coming home, they're on the other side of the interstate highway someplace, they get out of the car in the darkness in the middle of the night, walk across the interstate highway, jump across the fence, go down some canyon or something, throw the gun and pistol grips away, come back across the road and then leave. This is what we're supposed to believe now about the gun. . . .

> They left Flagstaff at 3:00 o'clock in the afternoon, it's 166 miles according to Alex Moreno then on from Flagstaff to where the gun was found if you come back this way. Is that the middle of the night, how do normal people travel on interstates, 166 miles in the middle of the night from 3:00 o'clock in the afternoon? Doesn't make too much sense . . . .

> MR. TABOR: Your Honor, I was going to impose an objection . . . . I did not say in the middle of the night, I said nighttime. There is a big difference.

> THE COURT: Okay. I'll let the jury remember what you said.

Boppre apparently claims that during his closing argument, he stated he awoke "at night," not "in the middle of the night," and, thus, the prosecutor improperly misquoted Boppre's closing argument. Brief for appellant at 43. The relevant portion of Boppre's closing argument is not in the record, and

we therefore are unable to determine whether the prosecutor did indeed misquote Boppre's argument. Moreover, Boppre testified at trial that when he awoke, it was "the middle of the night." Therefore, the prosecutor's remarks were not a misstatement of Boppre's actual testimony at trial.

Remarks made by the prosecutor during final argument which do not mislead or unduly influence the jury do not rise to the level sufficient to require granting a mistrial. *State v. Greeno*, 230 Neb. 568, 432 N.W.2d 547 (1988). In light of the fact that Boppre testified at trial that he awakened in the middle of the night, the prosecutor's statement could not have misled or unduly influenced the jury.

Although not raised in Boppre's new trial motion, Boppre also asserts that the prosecutor acted improperly by objecting during Boppre's closing argument to statements concerning Caywood's testimony. The district court did not permit Caywood to give his opinion at trial concerning the ability of a sighted person to write the descriptions found by Valdez' body in the dark. Thus, the prosecutor properly objected to Boppre's attempt to discuss Caywood's testimony on this matter.

### (b) Spectator Conduct

Boppre filed his affidavit and those of several members of his family, which stated that during their testimony certain members of the Valdez family, especially Valdez' brother, were mouthing obscene words or making various hand motions which distracted and upset them during their testimony. Boppre argues that he was prejudiced by the alleged misconduct of the various spectators

> [b]ecause of the nature of this case, and because of the extreme conflicting evidence which the record discloses, it is quite obviously extremely important that the defense witnesses be presented in a fair and impartial light to enable the jury to properly weigh their testimony. Since the jurors are the sole judge of the witnesses' credibility, based on watching the witnesses while testifying and observing their demeanor, etc., spectator influence on how a witness testifies or acts on the stand while testifying would adveresly [sic] affect the jurors' opinions as to whether or

not the witness was telling the truth . . . .
Brief for appellant at 48.

In *Lindsay v. State*, 46 Neb. 177, 64 N.W. 716 (1895), as the defendant took the witness stand, the mother of the victim rose from her seat, stepped forward, pointed her finger at the defendant, and accused him in an excited manner, " 'You have killed my boy! You have killed my boy!' " *Id.* at 182, 64 N.W. at 717. The judge then ordered the mother removed from the courtroom. We rejected the defendant's claim that this denied him a fair trial, stating at 182-83, 64 N.W. at 717:

> The language . . . in *Debney v. State*, 46 Neb., 856, so well illustrates the rule which should govern the branch of the case under consideration that without comment it is reproduced as follows: "It appears that at the close of the argument of the county attorney to the jury the spectators applauded by stamping of feet and clapping of hands, which applause was immediately suppressed by the presiding judge, who rebuked the persons for making the same. It was also shown that the applause was without the knowledge or connivance of those connected with the prosecution. * * The incident complained of occurred in the presence and hearing of the trial judge and he is better enabled than we to determine the effect, if any, the applause had upon the jury. . . . [T]he trial court must have been of the opinion that the demonstration was not of such a nature as to influence the verdict, and no prejudice being shown its determination will not be interfered with.

In *Wever v. State*, 121 Neb. 816, 238 N.W. 736 (1931), the defendant contended he was deprived of a fair trial because of hissing and applauding on the part of spectators in the courtroom during trial. We rejected this argument, stating:

> The court promptly rebuked such conduct and stated that if it occurred again the courtroom would be cleared. Ordinarily, this would be sufficient, but, aside from that, no objection was raised by defendant; nor is there anything in the record to disclose the nature or extent of the applause, or who was guilty of the misconduct. If counsel for defendant at the time had reason to apprehend or believe that such conduct would prejudice the rights of

> defendant, they should have then requested the court to declare a mistrial. Instead, they elected to proceed with the trial without objection, and took the chance of a favorable verdict, and now seek to overturn the verdict for causes which they knew and did not object to before the case was submitted to the jury.
>
> . . . Furthermore, it is a rule that demonstrations on the part of spectators do not constitute ground for a new trial where they are checked promptly and where it appears probable that the jury were not prejudiced thereby. [Citations omitted.] The evidence discloses nothing from which it could be inferred that defendant was in any wise prejudiced by whatever applause there may have been.

*Id.* at 819-20, 238 N.W. at 737-38. See, also, *Sundahl v. State,* 154 Neb. 550, 48 N.W.2d 689 (1951).

The responsibility for conducting a trial in an orderly and proper manner for the purpose of ensuring a fair and impartial trial rests with the trial court. *Wamsley v. State,* 171 Neb. 197, 106 N.W.2d 22 (1960). Boppre did not bring the spectators' actions to the district court's attention, request the district court to admonish the jury to disregard the spectators' actions, nor request a mistrial on the basis of the spectators' actions. There is no indication in the record that the district court judge was even aware of the spectators' actions. The district court impliedly determined, in ruling on Boppre's motion for new trial, that the witnesses were not so affected by the spectators' actions as to affect their credibility. There is nothing to show the district court abused its discretion in this determination.

## 16. Sentences

Finally, Boppre asserts that the district court imposed excessive sentences for the two use of a deadly weapon to commit a felony and the two robbery convictions.

As frequently stated, a sentence imposed within the limits prescribed by statute will not be set aside as excessive absent an abuse of discretion by the sentencing judge. *State v. Carter, ante* p. 378, 451 N.W.2d 271 (1990); *State v. Von Busch, ante* p. 119, 449 N.W.2d 237 (1989). In imposing a sentence, a sentencing judge should consider, among other things, the

defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988).

Neb. Rev. Stat. § 28-105 (Reissue 1985) provides that the penalty for use of a deadly weapon to commit a felony, a Class III felony, is a maximum of 20 years' imprisonment, a $25,000 fine, or both, and a minimum of 1 year's imprisonment. Section 28-1205(3) provides that use of a deadly weapon to commit a felony "shall be treated as a separate and distinct offense from the felony being committed, and sentences imposed under the provisions of this section shall be consecutive to any other sentence imposed."

Section 28-105 provides that the penalty for robbery, a Class II felony, is a maximum of 50 years' imprisonment and a minimum of 1 year's imprisonment.

Boppre makes the argument that his coperpetrator in the robbery, Niemann, was sentenced to a lesser term than he for the same crime. However, the mere fact that a defendant's sentence differs from those which have been imposed on coperpetrators in the same court does not, in and of itself, make the defendant's sentence an abuse of discretion; each defendant's life, character, and previous conduct may be considered in determining the propriety of the sentence. *State v. Nearhood*, 233 Neb. 767, 448 N.W.2d 399 (1989).

Considering the motivation for the offenses for which Boppre was convicted and the amount of violence involved, it cannot be said the district court abused its discretion in imposing its sentences.

## IV. DECISION

The record failing to support any of Boppre's assignments of error, the judgment of the district court is sustained.

AFFIRMED.