STATE OF NEBRASKA, APPELLEE, V. DWAYNE TUCKER, APPELLANT.
494 N.W.2d 572

Filed January 29, 1993.   No. S-92-083.

Thomas M. Kenney, Douglas County Public Defender, and Kelly S. Breen for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Dwayne Tucker appeals his conviction and life sentence for his participation in the first degree murder of Lisa Lisko, who was shot and killed December 23, 1981, by the defendant's half brother, Willie Tucker, during the perpetration of a robbery of a pancake house in Omaha where Lisko worked.

Because of a mixup as to which counsel was to represent him on direct appeal, Dwayne Tucker, hereinafter referred to as the defendant, was given leave to file a belated direct appeal.

In substance, the defendant complains that (1) his motion for change of venue should have been granted, (2) there was insufficient evidence to convict him, and (3) his sentence is excessive. We find that none of the defendant's assignments of error has merit and affirm his conviction and sentence.

## STANDARD OF REVIEW

In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Alcorn*, 240 Neb. 400, 481 N.W.2d 921 (1992); *State v. Schumacher*, 240 Neb. 184, 480 N.W.2d 716 (1992); *State v. Smith*, 240 Neb. 97, 480 N.W.2d 705 (1992); *State v. Williams*, 239 Neb. 985, 480 N.W.2d 390 (1992).

## FACTS

On Wednesday, December 23, 1981, at about 10:30 p.m., the then 17-year-old defendant received a telephone call from his half brother, Willie Tucker. Willie asked the defendant if he wanted to help his half brother "make some money." The defendant agreed to meet Willie at the home of their sister Kayletha, near 32nd and Grant Streets in Omaha. There was "a lot of snow on the ground," and it was cold that evening.

Nevertheless, the defendant walked approximately 1 mile to Kayletha's house, arriving at about 11 p.m. About 10 minutes later, the defendant and Willie left Kayletha's home and began walking south on 30th Street. While they were walking, Willie told the defendant, "We are going to rob the pancake house," to which the defendant responded, "Cool." At that time, the defendant knew that he would receive some of the robbery proceeds. The pair then walked to the International House of Pancakes at 29th and Dodge Streets, a distance of approximately 1 1/2 miles from 32nd and Grant.

Arriving at the pancake house sometime after 11 p.m., Willie and the defendant stood outside the building. They debated whether to go ahead with the robbery, because they knew that police officers often went there for dinner. Several witnesses observed Willie and the defendant in the restaurant's lobby area. One of the witnesses saw the same two men leave the restaurant and walk away. She had noticed the two men outside the building two or three times. The witness remembered that they seemed to be avoiding having her look at them. The witness left the restaurant to catch a bus, and as she was boarding the bus, she saw Willie and the defendant return to the restaurant.

After entering the restaurant, the defendant approached the cashier, Lisa Lisko, and requested change to buy cigarettes. As soon as Lisko opened the cash register, Willie produced a handgun, pointed it at Lisko, and told her, "This is a stick-up." Willie demanded the money in the cash register. After Willie convinced Lisko that the stickup was "for real," she handed Willie the money from the cash register. The defendant walked around Willie to leave the restaurant. Looking back from the entryway, the defendant saw Willie looking toward him and pointing the gun at Lisko. The defendant testified he heard three clicks and a gunshot. Lisko died of a gunshot wound to the right chest.

Both the defendant and Willie ran from the restaurant and, taking different routes, met near an interstate highway. The two proceeded to an apartment that Willie shared with his girl friend and their newborn infant. Willie and the defendant went into a bedroom and divided the money from the robbery. The

defendant received $35 as his share of the robbery proceeds. Willie received about the same amount of money.

The same witness who had observed the defendant and Willie in the lobby of the restaurant, and later observed them leaving and reentering the building, recognized Willie as a former neighbor. She learned of the shooting the following day, and contacted police on Monday, December 28. She identified Willie from a photographic lineup as being one of the two males she saw at the pancake house on the evening of December 23. She did not know the defendant and was unable to say he was the other male present at the restaurant.

The defendant was arrested for first degree murder on Thursday, December 31. After being advised of his *Miranda* rights, he admitted, in an untaped statement to two Omaha police officers, that he had been involved in the incident at the restaurant. The defendant then made a recorded statement in which he told police that he wanted to serve time with his brother, because "I was there with him and I stood there with him and I split the money with him."

At trial, the defendant maintained that his half brother had not asked him to do anything in connection with the robbery and did not discuss how the robbery was to take place. The defendant denied entering the restaurant with the intent to assist his brother in a robbery. He testified that he thought Willie had abandoned the robbery scheme before entering the restaurant. After a trial, the defendant was convicted by a jury of first degree murder and was sentenced to life imprisonment. In a separate trial, Willie was convicted of first degree murder and was also sentenced to life imprisonment. See *State v. Tucker*, 215 Neb. 636, 340 N.W.2d 376 (1983).

## CHANGE OF VENUE

The defendant first assigns as error that pretrial publicity prevented him from having a fair and impartial trial and that the trial court erred in failing to grant his two pretrial motions for change of venue.

A trial court's ruling on a motion for change of venue will not be disturbed absent an abuse of discretion. *State v. Williams*, 239 Neb. 985, 480 N.W.2d 390 (1992). A change of venue is to

be granted upon the motion of the defendant when it shall appear to the trial court by affidavits that a fair and impartial trial cannot be had in the county where the offense was committed. See Neb. Rev. Stat. § 29-1301 (Reissue 1989).

Factors to be considered in determining whether a change of venue is required due to pretrial publicity include the nature of the publicity, the degree to which the publicity has circulated in areas to which venue could be changed, the length of time between dissemination of the publicity complained of and the date of trial, the care exercised and ease encountered in selection of the jury, the number of challenges exercised during voir dire, the severity of offenses charged, and the size of the area from which the venire is drawn. *State v. Williams, supra*; *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990), *cert. denied* _____ U.S. _____, 112 S. Ct. 143, 116 L. Ed. 2d 109 (1991); *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990).

In support of his first motion for change of venue, the defendant submitted his attorney's affidavit in which the attorney stated:

> 3. On several occasions news articles have appeared in the Omaha World Herald mentioning that [defense counsel] is representing Defendant, Dwayne Tucker.
>
> 4. That on many occasions [defense counsel] has had residents of the City of Omaha, with whom he is acquainted, indicate to him that it was their wish that he would loose [sic] the case because it was their opinion that Defendant, Dwayne Tucker, was guilty of the crime charged.

The defendant presented no evidence as to how many news articles constitute "several." No articles from the Omaha World-Herald newspaper were presented, nor is there any evidence as to when these articles may have appeared in relation to the time of trial. There was no evidence presented as to the circulation of the Omaha World-Herald in Douglas County, nor was there evidence that residents of Douglas County read the Omaha World-Herald. The defendant fails to explain on appeal how the contents of articles in the Omaha World-Herald or other news media were prejudicial to him in any way.

A single affidavit stating that "many" residents of the county

in which the offense was committed hope that defense counsel loses a case because they believe the defendant to be guilty as charged has no probative value for the purposes of determining whether the defendant is entitled to a change of venue. See *State v. Boppre, supra.* This court has stated that voir dire examination is a better and more probative forum for ascertaining the existence of community and individual prejudice or hostility toward an accused than even a public opinion poll. See, *State v. Joubert*, 235 Neb. 230, 455 N.W.2d 117 (1990), *cert. denied* 499 U.S. 931, 111 S. Ct. 1338, 113 L. Ed. 2d 269; *State v. Boppre, supra.* The voir dire of the venire has not been made part of the record in this case. However, the jury roster indicates that out of 40 venirepersons, only 2 were stricken for cause. This is inconsistent with the notion of widespread community prejudice or hostility to the defendant.

The defendant has failed to demonstrate that he could not obtain a fair and impartial trial in Douglas County. Accordingly, the trial court did not abuse its discretion in overruling the defendant's motions for change of venue. The defendant's first assignment of error is without merit.

## SUFFICIENCY OF EVIDENCE

Second, the defendant contends that the evidence is insufficient to support his conviction of first degree murder. The defendant was charged with killing Lisko in the perpetration of a robbery, pursuant to Neb. Rev. Stat. § 28-303 (Reissue 1989).

Although it is undisputed that Willie Tucker, and not the defendant, shot Lisko, "A person who aids, abets, procures, or causes another to commit any [criminal] offense may be prosecuted and punished as if he were the principal offender." Neb. Rev. Stat. § 28-206 (Reissue 1989). Aiding and abetting involves some participation in a criminal act and must be evidenced by some word, act, or deed; no particular acts are necessary, nor is it necessary that any physical part in the commission of the crime is taken or that there was express agreement therefor, and mere encouragement or assistance is sufficient. *State v. Dean*, 237 Neb. 65, 464 N.W.2d 782 (1991). Even though he knew Willie planned to commit a robbery, the

defendant testified that he never agreed to help Willie. He further testified that he believed Willie had changed his mind about committing the robbery, and that he, the defendant, was merely going to buy a pack of cigarettes and leave the restaurant.

The record reflects that the defendant walked a considerable distance, late at night in the cold and snow, to help Willie "make some money." He continued to accompany Willie even after he learned that Willie planned to make money by robbing the International House of Pancakes. After learning of the plan, the defendant told Willie the plan was "[c]ool." From general knowledge of the meaning of the word "cool," as it is used in today's world, a jury could properly consider that comment by the defendant as approval of the plan to rob the pancake house and an encouragement to the defendant's half brother to commit the planned crime.

Once inside the restaurant, the defendant had Lisko open the cash register by asking for change for a cigarette machine, providing Willie the opportunity to demand the money in the cash drawer. The defendant waited to leave until Willie had the money. He then met Willie at the interstate highway, and the two went to Willie's apartment. Finally, the defendant accepted $35 as his share of the proceeds of the robbery.

Based on these facts, the evidence is more than sufficient for a jury to conclude beyond a reasonable doubt that by the defendant's meeting Willie "to make money," by the defendant's acknowledgement that he knew in advance that Willie was going to rob the International House of Pancakes, by the defendant's comment that the planned robbery was "[c]ool," and by the defendant's act of accompanying Willie to the restaurant, the defendant not only encouraged but also agreed to help Willie in the robbery. The jury could properly draw the inference that the defendant's role in the robbery was to have the cashier open the cash drawer so that his half brother could demand its contents. The jury's finding of guilt is strengthened by the fact that the defendant voluntarily fled from the scene immediately after the robbery and shooting. As an aid in determining the innocence or guilt of a defendant, a jury may consider the voluntary flight of a person immediately

or soon after the occurrence of a crime. See, *State v. Lincoln*, 183 Neb. 770, 164 N.W.2d 470 (1969); *Davis v. State*, 171 Neb. 333, 106 N.W.2d 490 (1960), *cert. denied* 366 U.S. 973, 81 S. Ct. 1939, 6 L. Ed. 2d 1262 (1961). The inference that the defendant participated in the robbery is further strengthened by the fact that after the defendant and Willie bolted from the restaurant after the robbery and shooting, each took a different route and then met near or at the interstate highway. A jury could conclude that even more convincing evidence of the defendant's participation in the crime with which he was charged is the fact that after these events had taken place, the defendant went into a bedroom of Willie's home and clandestinely, knowingly, and willingly received virtually an equal split of the robbery proceeds.

It is implicit in its verdict that the jury did not find credible the defendant's testimony that he believed Willie had renounced and abandoned the plan to rob the pancake house or that the defendant did not intend to participate in the robbery. The defendant remained with Willie throughout the robbery. He failed to do the one thing which would have unequivocally terminated his participation in the robbery plan devised by Willie. All the defendant had to do after learning of the robbery plan was to turn around and walk home. Instead, the defendant, by labeling the robbery plan "[c]ool," gave Willie encouragement to carry out the plan. The defendant's conduct before, during, and after the crime was also sufficient to convince a jury beyond a reasonable doubt that the defendant was an aider and abettor of the crime with which he was charged.

It is apparent that some of the evidence upon which the jury relied in convicting the defendant was circumstantial. Circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact exists. *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981); *Bland v. Fox*, 172 Neb. 662, 111 N.W.2d 537 (1961). Stated another way, circumstantial evidence is evidence of one or more facts from which another fact can logically be inferred. See, *State v. Rokus*, 240 Neb. 613, 483 N.W.2d 149 (1992); *State v. Witt*, 239 Neb. 400, 476 N.W.2d 556

(1991); NJI Crim. 1.31.

When some evidence in a case is circumstantial, such evidence is to be treated in criminal cases the same as direct evidence, and the State is entitled upon review to have all conflicting evidence, both direct and circumstantial, resolved in its favor. *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 676 (1992); *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991). Circumstantial evidence is adequate to support a conviction if the evidence, taken as a whole, establishes guilt beyond a reasonable doubt. *State v. Hanger*, 241 Neb. 812, 491 N.W.2d 55 (1992); *State v. Phelps, supra.*

One who intentionally aids and abets the commission of a crime may be responsible not only for the intended crime, if it is in fact committed, but also for other crimes which are committed as a natural and probable consequence of the intended criminal act. *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992); *State v. Trackwell*, 235 Neb. 845, 458 N.W.2d 181 (1990). Because the direct and circumstantial evidence, the defendant's admissions, and the inferences therefrom are sufficient to support a jury verdict that the defendant is guilty beyond a reasonable doubt of aiding and abetting Willie in the robbery of the International House of Pancakes, they are also sufficient to convict him of the first degree felony murder of Lisko, her death having occurred as a natural and probable consequence of that robbery.

## EXCESSIVE SENTENCE

Finally, the defendant complains that his life sentence is excessive. Murder in the first degree, of which the defendant was convicted, is either a Class I or a Class IA felony according to § 28-303. The penalty for a Class I felony is death, while the penalty for a Class IA felony is life imprisonment. Neb. Rev. Stat. § 28-105 (Reissue 1985). Because the defendant was under the age of 18 years at the time Lisko was murdered, the death penalty could not be imposed upon him. See Neb. Rev. Stat. § 28-105.01 (Reissue 1989). Since the defendant is guilty of a Class IA felony, the sole punishment in his case is life imprisonment. See § 28-105(1).

A sentence imposed within statutory limits will not be

disturbed upon appeal absent an abuse of discretion. *State v. Hall, ante* p. 92, 492 N.W.2d 884 (1992); *State v. Reichert, ante* p. 33, 492 N.W.2d 874 (1992); *State v. Miller*, 240 Neb. 297, 481 N.W.2d 580 (1992). In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Smith*, 240 Neb. 97, 480 N.W.2d 705 (1992).

The record reflects that in pronouncing sentence, the judge considered the defendant's young age, lack of formal education or secure employment, absence of strong family ties, and general negative attitude toward the laws of society. The imposition of a life sentence is consistent with the sentencing statute. Sentencing the defendant to probation, the only other option, would have been inappropriate under the circumstances of this case. Moreover, placing the defendant on probation would have depreciated the seriousness of the offense the defendant was found to have committed and would promote disrespect for the law, not only by this defendant but by others who might be inclined to commit the same type of offense. The sentencing court did not abuse its discretion.

## CONCLUSION

There being no merit to any of the defendant's assigned errors, this court affirms his conviction and sentence in the district court.

AFFIRMED.