IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. QUINN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

WILLIAM J. QUINN, APPELLANT.

Filed December 6, 2022.   No. A-21-1038.

Appeal from the District Court for Furnas County: JAMES E. DOYLE IV, Judge. Affirmed.

Charles D. Brewster, of Anderson, Klein, Brewster & Brandt, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

William J. Quinn appeals from his convictions following a jury trial in the district court for Furnas County of three counts of first degree sexual assault of a child, two counts of sex trafficking of a minor, three counts of manufacturing a visual depiction of sexually explicit conduct, two counts of possession of a visual depiction of sexually explicit conduct, two counts of enticement by an electronic communication device, and one count of child abuse. On appeal, Quinn claims that the district erred in certain evidentiary rulings and in failing to grant his motion to dismiss and motion for mistrial. He also claims that the evidence was insufficient to support his convictions for specific counts, that he received an excessive sentence, and that he received ineffective assistance from his trial counsel. Finding no error, we affirm.

- 1 -

## II. STATEMENT OF FACTS

This case arises out of a relationship between Quinn, born April 1964, and C.G., born October 2003. Quinn and C.G. began communicating over social media in March 2019 and developed a sexual relationship in June when C.G. moved back to Nebraska.

### 1. PRETRIAL PROCEEDINGS

On April 7, 2020, Quinn was charged by information with four felony counts arising out of his involvement with C.G. A preliminary hearing was held on March 13.

On July 8, 2020, the State filed an amended information which charged Quinn with four counts of first degree sexual assault of a child in violation of Neb. Rev. Stat. § 28-319.01(1)(b) (Reissue 2016), a Class IB felony; one count of first degree sexual assault in violation of Neb. Rev. Stat. § 28-319 (Reissue 2016), a Class II felony; two counts of sex trafficking of a minor in violation of Neb. Rev. Stat. § 28-830 (Cum. Supp. 2020), a Class IB felony; three counts of manufacturing a visual depiction of sexually explicit conduct in violation of Neb. Rev. Stat. § 28-1463.03(1) (Reissue 2016), a Class ID felony; two counts of possession of a visual depiction of sexually explicit conduct in violation of Neb. Rev. Stat. § 28-813.01(1) (Cum. Supp. 2020), a Class IIA felony; two counts of enticement by an electronic communication device in violation of Neb. Rev. Stat. § 28-833 (Reissue 2016), a Class IV felony; and one count of child abuse in violation of § 28-707 (Cum. Supp. 2020), a Class IIIA felony. Quinn thereafter entered a plea of not guilty to all charges set forth in the amended information and waived a preliminary hearing related to the amended information.

### (a) Motion for Change of Venue

On February 16, 2021, Quinn filed a motion for a change of venue, alleging that the "excessive" media coverage in Furnas County had inundated the jury pool to the point that a fair and impartial jury could not be impaneled in the county. In an amended motion for a change of venue, Quinn further alleged that a search for his name in Nebraska-based media produced 61 news stories related to his case and that the pretrial publicity included "inflammatory" information such as detailing the nature of his criminal charges, testimony from the preliminary hearing related to the original information, and noting the convictions of other individuals involved in the case.

A hearing on Quinn's motion was held on April 12, 2021, when Quinn offered multiple news articles reporting on his case. On May 3, the district court denied Quinn's motion for a change of venue, noting that the offered exhibits indicated no hostility or animosity towards Quinn, nor did any of the news articles appear to be factually inaccurate. The court further observed that the only evidence reported on by the media was testimony elicited at the preliminary hearing, and that the arrest affidavits had been sealed and were unavailable to both the public and members of the media.

### (b) Intent to Offer 404 Evidence

On April 27, 2021, the State filed a notice of intent to offer 404 evidence regarding Quinn's involvement in commercial sex trafficking encounters between S.G., C.G.'s older sister, and Daniel Nagy. The State alleged that the evidence was admissible for the specific and limited purposes of showing Quinn's intent, knowledge, and the absence of mistake or accident concerning

his human trafficking counts. On May 13, Quinn filed a motion in limine to preclude the State from offering the evidence related to S.G. and Nagy, alleging that the evidence was "classic propensity evidence" and that its probative value was substantially outweighed by the danger of unfair prejudice.

A hearing on both evidentiary motions was held on May 20, 2021. S.G. testified that in early 2018, she worked in a café owned by Quinn. A few months into her employment, Quinn began groping S.G.'s breasts and buttocks without her consent. Soon after, Quinn and S.G. began to have sexual intercourse, for which Quinn would pay S.G. Though S.G. asked Quinn to stop, he would remind S.G. that she was earning money for her family. S.G. testified that she did not enjoy engaging in commercial sex, but that she found it was easier to "just do it to get it done, and then it was okay." S.G. described feeling trapped by Quinn and that she had been "subtly threatened."

In the fall of 2018, when S.G. was 32 years old, Quinn approached S.G. about having intercourse with Nagy, a friend of Quinn's, noting that S.G. owed him a favor. S.G. described Quinn transporting her to Nagy's home, where she performed oral sex on Nagy. Afterwards, Nagy paid S.G. $50 and S.G. called Quinn to pick her up. S.G. noted that she performed commercial oral sex on Nagy two or three times, and that she never communicated directly with Nagy about the arrangement. Quinn would arrange the encounters between S.G. and Nagy, informing S.G. only minutes before the commercial sex was to occur.

Nagy testified consistently with S.G. In 2018, Quinn made arrangements to bring S.G. over to Nagy's home for a sexual encounter on three occasions. After S.G. performed oral sex, Nagy paid her $50, per Quinn's instructions. Nagy stated that Quinn orchestrated the encounters and that he did not communicate with S.G. directly.

In addition to the testimony of S.G. and Nagy, the State offered a transcript of Quinn's preliminary hearing on the original information and C.G.'s deposition. Quinn argued that the factual circumstances between the sexual encounters with S.G. and alleged encounters with C.G. were too different to be instructive to the jury.

In an order filed June 7, 2021, the district court sustained the State's notice of intent to offer 404 evidence. The court found by clear and convincing evidence that S.G.'s and Nagy's testimony was relevant for the purpose of showing intent, knowledge, and absence of mistake with regard to Quinn's human trafficking counts. The court further observed that the probative value of the testimony substantially outweighed the potential for unfair prejudice. In another order filed the same day, the court denied Quinn's motion in limine related to S.G.'s and Nagy's testimony.

(c) Pretrial Hearing

A journal entry filed by the district court on June 18, 2021, reflects that a pretrial hearing was held on June 14. The journal entry notes that the State moved to clarify each party's position on the proper venue for trial, and that comments were made by both parties regarding their position. However, the journal entry does not provide the position of each party regarding venue, nor is a bill of exception of the pretrial hearing included in our record. The journal entry also referenced the State's motion to dismiss Count I of the amended information, one of four counts of first degree sexual assault of child. Quinn did not object and the district court ordered the State to file a second amended information. A second amended information was filed by the State on June 16.

## 2. TRIAL

Trial was held over 8 days in June 2021. Over 30 witnesses testified and over 200 exhibits were offered into evidence. We have limited our recitation of the evidence adduced at trial to those details relevant to Quinn's assignments of error on appeal. Additionally, where we offer examples of Quinn's and C.G.'s correspondence and internet search history, we have directly quoted the parties' language.

### (a) State's Evidence

C.G. testified that she was born in October 2003 and spent her early childhood in Nebraska. In the spring of 2019, C.G. was 15 years old and living with family in North Carolina. During that time, Quinn reached out to C.G. through Facebook to ask if C.G. wanted a job waitressing at his café in Oxford, Nebraska. C.G. knew of Quinn as several of her older siblings worked for him in some capacity. C.G. told Quinn that she was interested in the job and the two began daily communication over Facebook, phone calls, and text messages. Within the first 3 days of C.G.'s and Quinn's communication, C.G. told Quinn that she was 16 years old because she believed she needed to be 16 in order to secure the waitressing position. However, a few days later C.G. told Quinn that she was actually 15 years old. Quinn advised that C.G. would be able to work for him no matter her age.

Within the first week of their communication, Quinn asked C.G. for a naked picture of herself. While C.G. initially denied Quinn's request and was "a little creeped out," she began sending Quinn explicit photos of herself a few weeks later because she wanted to leave North Carolina and work for Quinn.

C.G. moved back to Nebraska in the summer of 2019 and text messaged Quinn within 3 days of arriving to let him know that she was ready to begin working as a waitress. Quinn and C.G. made arrangements to meet later that day. Once together, Quinn instructed C.G. to get into his car to talk about the job. Quinn then drove C.G. to a cornfield where he began fondling C.G.'s breasts and buttocks. C.G. testified that she "kind of froze" when Quinn began touching her. After fondling C.G., Quinn pushed C.G.'s head towards his exposed penis and instructed her to perform oral sex on him. C.G. became scared and performed oral sex on Quinn for a few minutes before exiting his car and attempting to walk away. Quinn caught up to C.G. and proceeded to hold a knife to her throat and threaten her life. C.G. testified that she took his threat seriously. Quinn again demanded that C.G. perform oral sex on him and C.G. complied. When C.G. returned to her sister's home later that evening she did not disclose the events of the day because she was scared.

C.G. maintained regular contact with Quinn after their initial meeting out of fear. During the summer of 2019, C.G. testified that she and Quinn had near daily sexual encounters which included oral sex, digital penetration, and penile penetration. C.G. also continued to send Quinn explicit photos and videos of herself. C.G. noted that Quinn "expected" these explicit communications and would scream at C.G. if she did not provide them to him. C.G. testified to occasions when Quinn slapped her in the face. Quinn would also go through C.G.'s cell phone to monitor her correspondence and moved her into a property which he owned.

Also during the summer of 2019, Quinn began instructing C.G. to remove her clothing while driving around town in his car. Quinn would then invite local men to view and touch C.G.'s nude body. Other times, Quinn would advise C.G. to disrobe in front of men or send nude photos

of herself to men over social media. Quinn told C.G. that she needed to engage in commercial sex because she was living in one of his properties rent free.

C.G. testified to Quinn arranging for several men to have sex with her in exchange for money or for Quinn's own sexual gratification. Either Quinn or C.G. under Quinn's direction would inform the men that C.G. was 18 years old. Relevant to the sex trafficking charges are the sexual encounters between C.G. and Terry Smith and Carl Kramer.

C.G. first met Smith in the summer of 2019 when she was a passenger in Quinn's car. Smith and Quinn were chatting when Quinn instructed Smith to touch C.G. and noted that Smith could have sex with C.G. for $50. After Smith digitally penetrated C.G., he handed Quinn $50 and Quinn directed C.G. to follow Smith inside his home. Smith and C.G. had sexual intercourse and afterward C.G. text messaged Quinn to come pick her up from Smith's home. C.G. had repeated sexual encounters with Smith, for which Smith would pay $50 to Quinn directly or to C.G., who would then give the money to Quinn. C.G. testified that Quinn first arranged the commercial sex between C.G. and Smith, but that later C.G. and Smith would communicate with one another directly.

Smith's testimony was largely consistent with C.G.'s, noting that he met C.G. sometime between May and July of 2019. Smith further stated that a month prior to meeting C.G. in Quinn's car, Quinn came to Smith's home to tell him that Quinn had an 18-year-old girl working for him who "wants to make extra money." While Quinn did not specify how the girl was wanting to earn extra money, he also inquired about Smith's sex life and Smith "put two and two together." When Quinn arrived the following month with C.G. in his car, he indicated to Smith that C.G. was the girl he had previously referenced.

Smith admitted that he had repeated sexual encounters with C.G., for which he paid her $50. Smith agreed that he used Snapchat to communicate with C.G. after he gave Quinn his user name. Smith acknowledged that he had entered a plea of no contest to charges related to his commercial sex with C.G.

C.G. testified that she met Kramer in the fall of 2019 when Quinn took C.G. to a meat locker owned by Kramer. Quinn kept pulling up C.G.'s shirt to expose her breasts and instructing Kramer to touch C.G., and told Kramer that he could have sex with C.G. for $50. Quinn then took C.G.'s phone and added Kramer's user name on Snapchat from C.G.'s account. Kramer later communicated with C.G. on Snapchat and arranged for commercial sex in his office at the meat locker. Kramer paid C.G. $50, which Quinn took from C.G. after she returned home. C.G. estimated that she had commercial sex with Kramer five to 10 times. Occasionally, Quinn dropped C.G. off at Kramer's office for their prearranged sexual encounters.

Kramer testified that he first met C.G. in August 2019, when Quinn called Kramer over to his car and C.G. was in the passenger seat and naked below the waist. Kramer also received explicit photos of C.G. on four occasions through Snapchat. In October, Quinn mentioned that married men could have sex with C.G. so long as they "throw $50 at her." Quinn also told Kramer that C.G. was 18 years old.

Kramer testified to Quinn and C.G. coming to his meat locker together. But Kramer stated that in addition to Quinn exposing C.G.'s breasts, "[Quinn] said tell him what you want, and [C.G.] said 'I want him to touch me.' And so I did, and that lasted a minute or two." A few weeks later, C.G. asked Kramer over Snapchat if he wanted to have a sexual encounter with her, which Kramer

declined. However, shortly thereafter, Kramer contacted C.G. and invited her over to his office for sex, assuming that he would have to pay her for the encounter. Kramer estimated that he had commercial sex with C.G. on six occasions, for which he always paid C.G. $50.

Kramer acknowledged that he had pending charges related to his sexual encounters with C.G. and was hoping that his cooperation in Quinn's case would be considered by the State in resolving his own, though he had been given no assurances of that outcome.

Prior to the testimony of S.G. and Nagy, Quinn's attorney renewed her prior objection to the testimony, arguing that the commercial sex between S.G. and Nagy was not sex trafficking and was not related to the alleged crimes at issue in present case. The State argued that the testimony would establish whether Quinn knew that S.G. would receive money from Nagy in exchange for sex, and that the price of commercial sex with S.G. was the same as Quinn set for C.G. The district court overruled Quinn's objection.

The district court provided the jury with a rule 404 instruction, stating that the jury was about to hear evidence concerning sexual encounters between S.G. and Nagy, and that the evidence may only be considered for the "limited and specific purpose" of determining the existence of intent, knowledge, and absence of mistake with regard to the two counts of sex trafficking. The court further instructed the jury that they may not conclude or infer that Quinn is guilty of any of the charges being tried based upon this particular evidence. S.G. and Nagy testified about their sexual encounters consistently with their previous testimony during the evidentiary hearing in May 2021. Quinn had a continuing objection throughout their testimony.

Additionally, S.G. testified that when Quinn first began communicating with C.G. on Facebook in the summer of 2019, Quinn asked her how she knew C.G. S.G. advised that C.G. was one of her younger sisters and when Quinn inquired how old C.G. was, S.G. replied that C.G. was 15 years old. C.G.'s mother also testified that C.G. was born in October 2003.

Other evidence presented by the State included details of law enforcement's investigation. Deputy Alex Huntley of the Furnas County Sheriff's Office testified that in January 2020, C.G.'s brother-in-law contacted the sheriff's office regarding C.G.'s sexual encounters with various local men. Later that day, C.G. identified several men with whom she had sexual encounters and provided a written statement to Huntley. Huntley then executed a search warrant at Quinn's home and office, where officers seized a cell phone, a laptop, and a desktop computer.

The following day, C.G. provided law enforcement with her cell phone and Huntley arranged for her to have a forensic interview conducted by an investigator with the Attorney General's Office who specializes in human trafficking offenses. C.G. also met with a certified sexual assault nurse examiner, who conducted a vaginal exam. Both the investigator and the nurse examiner provided testimony regarding their experience with C.G.

LaTisha Connelly, an analyst with the Nebraska State Patrol, testified that she examined cell phone records, social media accounts, and various electronic devices, including C.G.'s cell phone and Quinn's computers. From March 2019 to January 2020, Quinn and C.G. exchanged over 15,000 text messages, some of which included photos and videos of themselves. Connelly testified that her digital analysis demonstrated Quinn first visited C.G.'s Facebook page in January 2019 and returned to the page many times over the following 3 months. On March 30, 2019, Quinn's internet history shows that he researched Nebraska laws regarding the legal age of consent; searching for terms such as "nebraska statutory law age of consent," "age for child

enticement laws in nebraska," and "nebraska sexual assault statutes." On September 1, 2019, Quinn texted messaged C.G., ". . . I wish you were 18 or 20!" To which C.G. responded, ". . . yea me too. 16 gonna be a lil bit better tho." In October 2019 (on the birthdate testified to by C.G.), Quinn's internet history shows that he searched "sweet 16 sex" and other sexually explicit terms and the number 16. Finally, several photos and videos found on Quinn's computer depicted C.G. engaging in various sexual acts.

At the conclusion of the State's evidence, Quinn moved to dismiss on the basis that the State had failed to make a prima facie case for all counts. The district court denied Quinn's motion to dismiss. Quinn then proceeded to introduce evidence.

## (b) Quinn's Evidence

Paul Brooks, a longtime neighbor and acquaintance of Quinn, testified that C.G. had incorrectly testified that she and Brooks had a sexual encounter in the basement of a specific home. However, on cross-examination, Brooks refused to answer a question regarding text message exchanges with C.G. and his testimony was stricken by the district court. The court also admonished the jury to disregard Brooks' testimony.

S.G.'s husband testified that in November of 2019, he had sexual encounters with C.G. approximately four or five times. C.G. had initiated the encounters and had assured the husband that the encounters were proper, as she had recently turned 16 years old and had researched the legal age of consent in Nebraska. The husband stated that Quinn was not involved in arranging these encounters, nor had C.G. told the husband that she was fearful of Quinn.

Francisco Lemus testified that in September 2019, he and his roofing crew were working on a home close to C.G.'s and C.G. would stand outside and flash her breasts at the crew while they worked. C.G. would also stand nude in front of a window and bang on the glass to attract attention from the crew. Lemus reported the behavior to his boss and was later interviewed by a member of law enforcement in March 2020.

Quinn offered several exhibits, including a certified copy of Smith's plea agreement, which were received into evidence. Quinn also offered the deposition of Bucky Weaver, an unavailable witness, but the State objected to the relevancy of the deposition. The State argued that Weaver had commercial sex with C.G. while she was being trafficked by an individual other than Quinn, and so Weaver's testimony was irrelevant to the proceedings. Quinn argued that C.G. had testified that Weaver had sexually assaulted her, which he denied in his testimony, and that "it goes to the credibility of the accuser, which is always relevant." The district court sustained the State's relevancy objection and did not receive Weaver's deposition. Outside the presence of the jury, Quinn made an offer of proof, highlighting that Weaver would testify that he met C.G. through Smith in August 2019, that C.G. told Weaver that she was 18 years old, and that they engaged in consensual sex.

## (c) Senator Sasse's Letter

On the evening of June 21, 2021, the fourth day of Quinn's trial, various news outlets reported that United States Senator Ben Sasse had written a letter to the Department of Justice requesting their assistance in prosecuting Quinn and his codefendants, whom he referred to as "child rapists." The following morning, Quinn moved for a mistrial or, alternatively, for the district

court and parties to individually poll the jury members to determine if any had been made aware of Sasse's comments. Quinn argued that because the statements from a recognized political figure in Nebraska were "highly inflammatory," he had been "completely stripped" of his constitutional right to a fair and impartial jury trial.

The district court stated that it too was aware of Sasse's comments and was "dismayed by those." The court took Quinn's motion for a mistrial under advisement, pending the individual polling of jury members.

All 14 members of the jury (including the alternates) were questioned by the district court and both counsel as to their knowledge of Sasse's letter and statement. Twelve of the jurors were unaware of Sasse's comments. One juror had seen a reference to Sasse's letter on social media, but quickly scrolled past the post. Another juror had heard mention of a letter written by Sasse related to Furnas County on a news program but had then muted the television and left the room. At the close of each juror's interview, they were personally admonished by the court to not read or listen to any reports regarding the case. Satisfied that the jurors' impartiality had not been compromised by Sasse's comments, the court denied Quinn's motion for mistrial.

After the lunch recess, a third juror advised the district court through a note that during the recess a community member had approached him at a gas station and had started to relay "something he saw or heard about Ben Sasse." The juror stated that he stopped the conversation immediately and had written the note to the court because he presumed the information about Sasse was related to the court's polling that morning. The court shared the juror's note with both parties, who agreed that no further action was required.

### 3. DELIBERATION, VERDICT, AND POSTTRIAL PROCEEDINGS

After 5 hours of deliberation, the jury found Quinn guilty of counts I through III (first degree sexual assault of a child), counts V and VI (sex trafficking of a minor), counts VII through IX (manufacturing a visual depiction of sexually explicit conduct), counts X and XI (possession of a visual depiction of sexually explicit conduct), XII and XIII (enticement by electronic communication device), and count XIV (child abuse). The jury found Quinn not guilty of count IV, first degree sexual assault. Following the jury's return of its verdicts, the district court asked each member of the jury whether Sasse's statements had affected the outcome of the case, and each answered that it had not. The court accepted the verdicts of the jury and ordered a presentence investigation report.

On July 2, 2021, Quinn filed a motion for a new trial, alleging insufficient evidence, legal errors, and that the State, district court, and Sasse caused irregularities in the proceedings. Following a hearing on July 21, the district court denied the motion in a journal entry filed on July 26. In denying Quinn's motion, the court found that Quinn had not been prejudiced by Sasse's comments as only two of the 14 jurors had heard that Sasse had made comments about the case and none had heard any substantive information conveyed in Sasse's comments. The court was additionally satisfied with each juror's assurances that they did not consider Sasse's comments during deliberations. The court allowed Quinn 1 week to supplement the record by offering a copy of Sasse's letter to the Department of Justice as an exhibit. The letter does not appear in our record on appeal.

Quinn's sentencing hearing was held on December 22, 2021. The district court sentenced Quinn to 30 to 50 years' imprisonment on each of counts I through III, V, and VI, noting that for counts I through III, 15 years of each minimum term are the mandatory minimum and Quinn must serve all such 15 years without credit for good time. On each of counts VII through IX, Quinn was sentenced to 15 to 35 years' imprisonment, with 3 years being the mandatory minimum for which Quinn must serve without credit for good time. Quinn was sentenced to 10 to 15 years' imprisonment on both counts X and XI; 9 to 24 months' imprisonment on both counts XII and XIII; and 9 to 27 months on count XIV. The court ordered counts I through III, V, and VI to run consecutively to one another; counts VII through XIII to run concurrently with one another but consecutively to the first five counts, and count XIV to run consecutively to all counts. Quinn was credited with 704 days for time previously served.

Quinn appeals.

## III. ASSIGNMENTS OF ERROR

Quinn assigns, restated and reordered, that the district court erred in (1) admitting rule 404 testimony and not receiving the deposition of an unavailable witness; (2) denying his motion to dismiss; (3) denying his motion for mistrial; and that (4) the evidence was insufficient to support specific convictions; (5) the sentences imposed were excessive; and (6) his trial counsel was ineffective for failing to provide affidavits in support of his motion for change of venue, to enter Sasse's letter in evidence, and to object and stipulating to the admission of electronic devices into evidence.

## IV. ANALYSIS

### 1. EVIDENTIARY RULINGS

We review for abuse of discretion a trial court's evidentiary rulings on relevance, whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, and the sufficiency of a party's foundation for admitting evidence. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). We also review for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under rule 404(2), or under the inextricably intertwined exception to the rule. *State v. Burries, supra*. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

### (a) Rule 404 Evidence

Quinn assigns that the district court erred in allowing Nagy and S.G. to testify regarding their alleged sexual encounters at trial. Quinn argues that the State intended to offer evidence that Quinn had arranged for Nagy and S.G. to have commercial sexual encounters on three occasions, but that the testimony was not intertwined with the alleged offenses related to C.G. Moreover, Quinn contends that the testimony was extremely prejudicial and "very likely gave the jury a false impression concerning any motives or intent. . . ." Brief for appellant at 20.

Neb. Rev. Stat. § 27-403 (Reissue 2016) states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Neb. Rev. Stat. § 27-404(2) (Reissue 2016) provides the following:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Neb. Rev. Stat. § 28-830(12) (Cum. Supp. 2020) defines sex trafficking of a minor as "knowingly recruiting, enticing, harboring, transporting, providing, soliciting, or obtaining by any means . . . a minor for the purpose of having such minor engage in commercial sexual activity . . ." Therefore, whether Quinn had the intent to have C.G. engage in commercial sex was a question before the jury.

At trial, Nagy and S.G. both testified that Quinn had facilitated their three commercial sexual encounters. Quinn initially approached both Nagy and S.G. about having a sexual encounter with one another, instructed Nagy to pay S.G. $50 for the encounters, and provided S.G. with transportation to and from Nagy's home.

The sexual encounters between S.G. and Nagy, and between C.G. and Smith and Kramer, have several similarities that bear on Quinn's intent to traffic C.G. Both Smith and Kramer testified that they were introduced to C.G. by Quinn, that Quinn initially proposed that the men have commercial sex with C.G., and that Quinn informed the men that the sexual encounters would cost $50. Quinn also transported C.G. to Smith's home and to Kramer's office before offering commercial sex with C.G.

We conclude that the district court did not abuse its discretion by admitting the testimony of S.G and Nagy to show intent, knowledge, and absence of mistake with regard to the two counts of sex trafficking of a minor under rule 404(2). We also note that the probative value of the testimony was not outweighed by the danger of unfair prejudice, as the district court instructed the jury to only consider the testimony for the prescribed limited and specific purpose, and not to infer that Quinn is guilty of any charges based upon S.G.'s and Nagy's testimony. See *State v. Davis*, 290 Neb. 826, 834, 862 N.W.2d 731, 737 (2015) (an admonishment of the jury is typically sufficient to cure any prejudice).

Lastly, though Quinn argues that the commercial sexual encounters between Nagy and S.G. are not intertwined with the alleged offenses related to C.G., under our decisional law, the evidence must be inextricably intertwined with the charged crime only if rule 404(2) does not apply. See *State v. Burries, supra*. As we have found that the district court did not abuse its discretion by admitting the testimony under the exceptions of rule 404(2), we need not consider whether the various sexual encounters were inextricably intertwined. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *State v. Moore*, 312 Neb. 263, 978 N.W.2d 327 (2022). This assignment of error fails.

### (b) Weaver Deposition

Quinn next assigns that the district court erred by not admitting Weaver's deposition into evidence, finding that it was not relevant. Quinn argues that he sought to use Weaver's deposition

to show that C.G.'s testimony lacked credibility. Quinn further contends that the exclusion of Weaver's deposition violated his right to present a complete defense and to a fair trial.

All relevant evidence is admissible except as otherwise provided by law, and evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. See Neb. Rev. Stat. § 27-401 (Reissue 2016). The bar for establishing evidentiary relevance is not a high one and requires only the probative value of the evidence to be something more than nothing. *State v. Abligo*, 312 Neb. 74, 978 N.W.2d 42 (2022).

Quinn argues that C.G.'s credibility is relevant to the counts of first degree sexual assault of a child. However, while Quinn contends that C.G. telling Weaver that she was 18 years old in September 2019 was central to his defense, the possibility that a child has engaged in active concealment or misrepresentation of age does not exculpate a perpetrator who is accused of first degree sexual assault of a child under § 28-319(1)(c). *State v. Campbell*, 239 Neb. 14, 473 N.W.2d 420 (1991). We find below that the evidence was sufficient to prove that C.G. was 15 years old in September 2019, and thus her alleged misrepresentation to Weaver regarding her age does not amount to exculpatory evidence. Weaver's deposition is therefore not relevant to evaluate C.G.'s credibility on these counts.

Quinn next argues that C.G.'s credibility is relevant to the counts of human trafficking. Credibility of a witness is not at issue when the truth of the assertions are not in dispute. *State v. Wood*, 310 Neb. 391, 394, 966 N.W.2d 825, 831 (2021). Here, the involvement of Quinn in C.G.'s commercial sex is in dispute, as C.G.'s testimony places him at the center of the arrangements and Quinn contends that C.G. initiated her own sexual encounters without Quinn's involvement. Given the low bar for relevancy, Weaver's deposition was relevant to C.G.'s credibility regarding the counts of human trafficking.

However, Weaver's deposition was properly excluded from evidence because his testimony likely would have caused confusion of the issues for the jury. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of confusion of the issues. See § 27-403. When the State objected on the basis of relevancy, Quinn responded by arguing that Weaver's testimony would undermine C.G.'s accusation that Weaver had sexually assaulted her, diminishing her credibility as a witness. However, Weaver's testimony would have likely confused the issues as it related to C.G.'s accusation of sexual assault against Weaver, not Quinn. Additionally, using an alleged sexual assault perpetrated by an individual other than Quinn as the metric by which to assess C.G.'s credibility would be confusing given the variety of sexual crimes and participants discussed during the trial. Thus, although relevant, the probative value of Weaver's testimony was outweighed by the danger that it would confuse the issues at trial.

Quinn generally argues that Weaver's testimony regarding C.G.'s representation of her age as 18 and that Quinn did not arrange this encounter would have aided his defense. However, multiple witnesses, including C.G., testified that C.G. communicated to men that she was 18 years old and that she arranged for some sexual encounters directly. Thus, to the extent the exclusion of Weaver's deposition was error, it was harmless. In a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record,

did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. See *State v. Madren*, 308 Neb. 443, 954 N.W.2d 881 (2021).

The right to present a complete defense does not allow a defendant "an unfettered right to offer testimony that is . . . otherwise inadmissible under standard rules of evidence." *State v. McCurry*, 296 Neb. 40, 66, 891 N.W.2d 663, 681 (2017). Weaver's deposition testimony was properly excluded for the reasons set forth above. A correct result will not be set aside merely because the lower court applied the wrong reasoning in reaching that result. *State v. Burries*, 310 Neb. 688, 969 N.W.2d 96 (2022). This assignment of error fails.

## 2. MOTION TO DISMISS

Quinn challenges the denial of his motion to dismiss. After the district court overruled Quinn's motion to dismiss all counts, the defense proceeded to call witnesses and offer exhibits. A defendant who moves for dismissal or a directed verdict at the close of the evidence in the State's case in chief in a criminal prosecution and who, when the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge correctness in the trial court's overruling the motion for dismissal or a directed verdict but may still challenge the sufficiency of the evidence. *State v. Guzman*, 305 Neb. 376, 377, 940 N.W.2d 552, 556 (2020). By proceeding to introduce evidence after the motion to dismiss was overruled, Quinn waived the right to challenge the district court's ruling on appeal.

## 3. MOTION FOR MISTRIAL

Quinn asserts that the district court erred by denying his motion for mistrial. He argues that the jury was tainted due to Sasse's letter and the resulting media coverage. Quinn also contends that the district court's questioning of the jurors actually "contributed to the jurors knowing about [Sasse] writing such a letter by engaging them in specific questioning about the letter." Brief for appellant at 25.

Decisions regarding motions for mistrial are directed to the discretion of the trial court and will be upheld in the absence of an abuse of discretion. *State v. Madren, supra*. A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019). The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id*. Extraneous material or information considered by a jury can be prejudicial without proof of actual prejudice if (1) the material or information relates to an issue submitted to the jury and (2) there is a reasonable possibility that it affected the jury's verdict to the challenger's prejudice. *State v. McSwine*, 24 Neb. App. 453, 890 N.W.2d 518 (2017).

In this case, the district court questioned each juror individually about any exposure to the Sasse letter and the news coverage in question. Twelve of the 14 jurors had no knowledge of either, while one "saw something on Facebook but scrolled right by it," and the other saw a newscast reference to the letter but immediately muted his television and left the room. In the hours after

the district court's questioning, another juror advised the court that during the lunch hour a local resident had approached him and started to relay something the resident had heard about Sasse. The juror stopped the conversation immediately and upon returning to the courthouse, wrote a note to the court advising it of the interaction. The court shared the juror's note with counsel for both parties, who agreed that no further action was required. The court admonished the jury multiple times throughout the trial not to read anything about the case or talk to any of the other jurors about the case until deliberations. "An admonishment of the jury is typically sufficient to cure any prejudice." *State v. Davis*, 290 Neb. 826, 834, 862 N.W.2d 731, 737 (2015). Further, absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict. *State v. Henderson*, 301 Neb. 633, 920 N.W.2d 246 (2018).

Quinn cannot show that he was prejudiced by Sasse's letter and the resulting media coverage during his trial. There is no indication that the three jurors discussed above, or any of the other jurors, failed to follow the district court's instructions. There is nothing to show that the three jurors' exposure to a social media post, news coverage, or community conversation about Sasse's letter influenced the jury so as to taint the outcome of the case. We also note that none of the three jurors had actually seen or read Sasse's letter. The district court did not err in denying Quinn's motion for mistrial. This assignment of error fails.

### 4. SUFFICIENCY OF EVIDENCE

Quinn asserts that there was insufficient evidence to support the majority of his convictions. Quinn argues that C.G.'s age was a necessary element to obtain a conviction for first degree sexual assault of a child, human trafficking of a minor, possession of visual depiction of sexually explicit conduct, enticement by an electronic communication device, and child abuse. Quinn contends that the State did not prove C.G.'s age beyond a reasonable doubt and therefore his convictions of the above counts should be reversed.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

That the victim is a certain age at the time of the offense is a necessary element of the crimes Quinn references in his argument. See, § 28-319.01(1)(b) (an element of first degree sexual assault of a child is that the victim is at least 12 but less than 16 years old); § 28-830(10) (an element of human sex trafficking of a minor is that the victim is less than 18 years old); § 28-813.01(1) (an element of possession of visual depiction of sexually explicit conduct is that the victim participant is a child, defined as less than 18 years old by Neb. Rev. Stat. § 28-1463.02(1) (Reissue 2016)); § 28-833 (an element of enticement by an electronic communication device is that the victim is less than 16 years old); § 28-707 (an element of child abuse is that the victim is a minor child, defined as less than 19 years old by Neb. Rev. Stat. § 43-2101(1) (Cum. Supp. 2020)).

The jury found that the State had sufficiently proven C.G.'s age in order to convict Quinn of all counts where the victim's age is an element of the crime. Both C.G. and her mother testified that C.G.'s birthday was in October 2003, making her 15 years old at the time of Quinn's communications with, and assaults on, C.G. Quinn argues that the State failed to produce definitive proof of C.G.'s age through a certified birth certificate or other document and that both C.G. and her mother lacked credibility. The credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review. *State v. Tucker*, 301 Neb. 856, 870, 920 N.W.2d 680, 690 (2018).

Though no birth certificate or documentation was furnished at trial to prove C.G.'s date of birth, the record contains evidence beyond the testimony of C.G. and her mother that C.G. was 15 years old during the summer and early fall of 2019. That evidence includes S.G.'s testimony that she relayed to Quinn that C.G. was 15 years old in early 2019; text messages dated September 1, 2019, in which Quinn wished C.G. was 18 or 20, and C.G. agreed but suggested "16 gonna b a lil bit better;" and Quinn's internet history, which showed that on the date of C.G.'s birth as testified to by C.G. and her mother, Quinn searched for "sweet 16 sex" and other terms related to sexual acts and the age 16. Viewed in the light most favorable to the prosecution, the evidence was sufficient to establish that C.G. was 15 during the time of the offenses. This assignment of error fails.

## 5. EXCESSIVE SENTENCE

Quinn was convicted of five Class IB felonies, three Class ID felonies, two Class IIA felonies, two Class IV felonies, and a Class IIIA felony. A Class IB felony is punishable by a minimum of 20 years and a maximum of life imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2020). However, three of Quinn's Class IB felonies result from his convictions for first degree sexual assault of a child pursuant to § 28-319.01, which sets forth a mandatory minimum sentence of 15 years' imprisonment for the first offense. See, also, *State v. Russell*, 291 Neb. 33, 863 N.W.2d 813 (2015) (minimum sentence for first degree sexual assault of a child is 15 years' imprisonment). Quinn was sentenced to consecutive terms of 30 to 50 years' imprisonment for the five Class IB felonies (sexual assault of child and sex trafficking of minor). A Class ID felony is punishable by a mandatory minimum of 3 years and a maximum of 50 years' imprisonment. See § 28-105. Quinn was sentenced to concurrent terms of 15 to 35 years' imprisonment on the three Class ID felonies (manufacturing visual depiction of sexually explicit conduct). A Class IIA felony is punishable by up to 20 years' imprisonment. *Id*. Quinn was sentenced to concurrent terms of 10 to 15 years' imprisonment on the two Class IIA felonies (possession of visual depiction of sexually explicit conduct). A Class IV felony is punishable by up to 2 years' imprisonment and 12 months' post-release supervision, a fine of $10,000, or both. *Id*. Quinn was sentenced to concurrent terms of 9 months to 24 months' imprisonment on the Class IV felonies (enticement by electronic communication). A Class IIIA felony is punishable by up to 3 years' imprisonment, a fine of $10,000, or both. *Id*. Quinn was sentenced to 9 to 27 months' imprisonment on the Class IIIA felony (child abuse). The Class ID, Class IIA, and Class IV felonies were ordered to run consecutively to the sentences for the Class IB felonies and the Class IIIA felony was to be served consecutively to all other sentences imposed. Quinn's sentences were within statutory limits.

Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits. *State v. Grant*, 310 Neb. 700, 968 N.W.2d 837 (2022). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). The sentencing court is not limited to any mathematically applied set of factors, but the appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Quinn argues that the district court did not adequately consider that he was a local business man in a rural community, had spent years around his daughters and their friends without incident, and was not fully aware of the victim's age or her lack of consent. Quinn also contends that the court sentenced him to the functional equivalent of life imprisonment. He argues that the court erred in not ordering Quinn's sentences to be served concurrently, as all of Quinn's crimes "occurred from the same nucleus of operative fact and transaction." Brief for appellant at 27.

The presentence investigation report (PSI) prepared in this case indicates that Quinn was 57 years old at the time of the offense, has some college education, and was working in construction. His criminal history includes convictions for possession of methamphetamine with intent to deliver, third degree sexual assault, driving under the influence, reckless driving, and various speeding violations. Quinn was assessed under the Vermont Assessment of Sex Offender Risk tool and scored a 30 on the reoffense risk scale and a 55 on the severity scale, indicating a high risk to recidivate. Quinn scored in the medium/low risk to reoffend on the overall LS/CMI assessment.

At the sentencing hearing, the district court stated that it had reviewed the lengthy PSI, had considered Quinn's comments and the comments of counsel, and had read the numerous letters of support submitted on Quinn's behalf. The court stated that it considered the relevant statutory factors, including Quinn's age, education, mentality, past criminal record and motivation for the offense as well as the nature of the offense. The court noted that Quinn's crimes had caused serious harm and that Quinn's character and attitudes indicated a likelihood of reoffending. It is clear that the court considered the appropriate factors in sentencing Quinn.

While Quinn argues that the district court should have imposed concurrent sentences, we note that the district court ordered counts VII-XIII to be served concurrently with one another. Further, it is within the discretion of the trial court to impose consecutive rather than concurrent sentences for separate crimes even when crimes arise out of same incident. *State v. Artis*, 296 Neb. 172, 893 N.W.2d 421 (2017), *modified on denial of rehearing*, 296 Neb. 606, 894 N.W.2d 349. Thus, we find no abuse of discretion in the sentences imposed.

## 6. INEFFECTIVE ASSISTANCE OF COUNSEL

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Drake*, 311 Neb. 219, 971 N.W.2d 759 (2022). In

reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

Quinn has different counsel on direct appeal than he did at trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the ineffective assistance of trial counsel issue will be procedurally barred. *Id.*

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id*. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id*. Conversely, an ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *Id*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. John*, 310 Neb. 958, 969 N.W.2d 894 (2022). To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *Id*. To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. John, supra*. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id*. The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id*.

(a) Failure to Offer Affidavits

Quinn claims that his counsel was ineffective for failing to support his motion for change of venue with affidavits from residents of Furnas County, "that indicated opinions of [Quinn] and his guilty [sic] for the crimes charged." Brief for appellant at 16. However, Quinn does not specifically allege that residents of Furnas County had negative opinions of him or that they had already determined his guilt for the crimes. We also note that while the issue of venue was further discussed at the pretrial conference, we do not know the position taken by Quinn at that time. Further, Quinn participated in voir dire and has not alleged that he was unable to select an impartial jury. Quinn has not assigned any error related to the jury selection process. Voir dire examination is a better and more probative forum for ascertaining the existence of community and individual prejudice or hostility toward an accused than even a public opinion poll. *State v. Tucker*, 242 Neb. 336, 337, 494 N.W.2d 572, 574 (1993). Quinn has not demonstrated that his counsel was deficient in failing to offer affidavits from members of the Furnas County community. We also find that

Quinn cannot show that counsel's failure to provide affidavits from local residents was prejudicial to his ability to obtain a fair and impartial jury. Therefore, this claim fails.

### (b) Failure to Offer Sasse's Letter

Next, Quinn claims that his counsel was ineffective for failing to offer Sasse's letter into evidence for the record on appeal. Quinn argues that, "[w]ithout the actual statement of Senator Sasse being made part of the record, it is impossible for an Appellate court to properly review the circumstances of the matter" for the purpose of evaluating the district court's determination on Quinn's motion for mistrial. Brief for appellant at 17. But as we noted in our analysis above, no members of the jury had seen or read Sasse's letter, nor were any jurors generally aware of the contents of the letter. Therefore, Quinn is unable to show that the inclusion of the letter in our record was necessary for the resolution of his claims. Because Quinn cannot show prejudice, this claim fails.

### (c) Failure to Challenge Foundation for Electronics

Finally, Quinn claims that his counsel was ineffective for failing to object to various electronic exhibits and for stipulating to foundational requirements for their admission into evidence. However, the stipulations made by Quinn's counsel were limited to the lab technicians who extracted data from C.G.'s cell phone and Quinn's laptop hard drive. All other foundational requirements for those items, including the chain of custody, were established through testimony at trial. Proof that an exhibit remained in the custody of law enforcement officials is sufficient to prove a chain of possession and is sufficient foundation to permit its introduction into evidence. See *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016).

We also reject Quinn's argument that his counsel was ineffective for failing to object to the admissibility of all electronic devices simply because the charges against him were serious. Quinn does not argue that the electronic exhibits were compromised or corrupted in any way, only that counsel was "per se" ineffective for failing to object. Defense counsel does not perform in a deficient manner simply by failing to make the State's job more difficult. *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016). Given that Quinn is unable to show deficient performance, this claim also fails.

### V. CONCLUSION

Viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to support Quinn's convictions and find no abuse of discretion in the sentences imposed. We find the district court did not abuse its discretion in allowing rule 404 testimony at trial and excluding the deposition of an unavailable witness. We find no abuse of discretion in the denial of Quinn's motion for a mistrial and find that he waived his challenge to the court's denial of his motion to dismiss after the State rested. We determine that the record is sufficient to evaluate and reject Quinn's claims of ineffective assistance of counsel. We therefore affirm the convictions and sentences.

AFFIRMED.